CHANCERY.

*Case* 47.

*December* 18.

# Trimbles *vs* Harrison *et al.*

ERROR TO THE GREENUP CIRCUIT.

*Alien.  Treaty with England of* 1794.  *Descent.*

JUDGE MARSHALL delivered the Opinion of the Court.—The Chief Justice did not sit in this case.

Compl't. asking a decree for conveyance aud possession, and showing no title, either *legal* or *equitable*, is entitled to no decree—nor is a def't. on prayer for a conveyance, who fails in like manner to show title, entitled to a decree for a conveyance.

Complainants claim of title.

Defendants answer and cross bill.

Answer to cross bill.

WE deem it necessary to notice one only of the numerous objections made by the Trimbles, to the title set up by Harrison in the original bill, and by him and John Dixon and wife, in their cross bills.  If neither of them has any title, legal or equitable, to the land, which is the subject of controversy, or to any part of it, neither of them is entitled to any part of the relief sought in the bill and cross bills, and it was erroneous to decree, on their prayer, the specific execution of the several contracts made by David Trimble, for the purchase of their supposed title, after the original bill was filed.

Harrison claims title by deed from John Dixon and his wife, Ann Eyre Dixon, the daughter and sole heiress of Richard Smith, to whom James Hutchinson, the patentee, conveyed by deed in January, 1787.

The Trimbles, in their answer and cross bill, allege that if the title of Hutchinson passed to Richard Smith, it did not descend to his daughter Anne Eyre Dixon, on two grounds, of which the first is, that Richard Smith was, from his birth to his death, an alien, under allegiance to the King of Great Britain, and the second, that his daughter, Anne Eyre, as well as her husband, was at his death, and ever since, an alien under the same allegiance.

Harrison and J. Dixon and wife, in answer to these allegations, deny that Richard Smith was an alien at his death, and also deny the alienage of his daughter, Anne Eyre, who, they allege, was born within the United States.  They allege that Richard Smith resided at Boston, before and at the  Declaration of Independence, in 1776; that he continued to reside in the United States during the revolutionary war, and at and after the treaty

of peace; that in 1783, he resided in Connecticut and was admitted a member of that state; that he afterwards, in 1786, removed to New York, where he resided in 1787, when the deed from Hutchinson to him was made, and that he was a citizen of the United States at time of the treaty of peace in 1783, and so continued until his death in 1818.

The proof on the part of said Harrison and Dixon and wife, (and no other proof was taken on this point,) corresponds substantially with these allegations, in regard to R. Smith, and conduces to show further, that in 1782 he was residing in the city of New York, but intending to remove to Connecticut, and that in January, 1783; he was admitted a member of that state by a resolution of its legislature. The evidence also conduces to prove that Anne E. Dixon, the daughter of R. Smith, was born at Boston in 1773, that she was afterwards, but at what time does not appear, taken to England, where, in 1798, at twenty-five years of age, she was married to John Dixon, a resident subject of Great Britain, and that they have ever since resided in England, where R. Smith died in 1818: but how long he had been in England before his death, or for what purpose he went there, does not appear.

By a well known principle of the common law, and of our law, lands in this country do not pass from or to an alien, by descent: but upon the death of the person last seized, without heirs, who are capable of inheriting, the title vests in the Commonwealth without office found.

It is, however, provided by the 9th article of the treaty of 1794, between the United States and Great Britain, that British subjects, who now hold lands in the United States, shall continue to hold them, &c. and that as to such lands and the legal remedies incident thereto, neither they nor their heirs shall be regarded as aliens. It has been decided that the treaty protects the title, whatever it is, and gives to it the same validity as if in the hands of a citizen. It has also been decided, and it is the obvious import of the treaty, that it only protects titles held by British subjects at the date of the treaty.

The title then being assumed to have been in R. Smith in 1794, by the deed of Hutchinson, if he was

<div style="margin-note">
TRIMBLES
vs
HARRISON et al.

Proof in the case.

By common law lands do not pass by descent from or to an alien.

Provisions of the treaty with Great Britain of 1794, Art. 9, by which lands *then held* by British subjects might be held, with all the legal remedies incident thereto.

One born a subject of G. Britain, but in 1772,
</div>

TRIMBLES *vs* HARRISON *et al.*

a resident of the territory of the now U. S. and so remaining until after the treaty of 1794, was thereby protected in his right to hold lands, and lands previously conveyed vested in him.

then a British subject, he was within the words and operation of the treaty, and as to this title and the lands which it includes, and the remedies incident thereto, neither he nor his heiress, though aliens to all other purposes, are to be regarded as aliens; and in that case, neither his alienage nor that of his heiress would present any obstacle to the passage of the title by descent, from him to her, nor to the operation of the appropriate remedy for their recovery of the land. But if he was not a subject of Great Britain, but a citizen of the United States in 1794, then the privilege given by the treaty does not attach to him, and the alienage of his daughter Anne Eyre Dixon, would, under the general law as to the rights of aliens, preclude her claim by inheritance. The first question then is, whether Richard Smith was, in 1794, a subject of Great Britain or a citizen of the United States.

Each party assuming a position directly opposed to his interest, shall not be prejudiced thereby, where it is a deduction of law and not dependent on a single fact.

John Dixon and Anne Eyre Dixon, the heiress, and Harrison, their alienee, all claiming title by the descent from R. Smith, allege that he was a citizen of the United States, while Trimble, claiming that there was no descent, alleges that he was a subject of Great Britain. Each party, therefore, on this point, assumes a position directly hostile to his own interest. But alienage or citizenship not being a simple fact, but being, in this case, a deduction of law from various facts, we think that neither party should be prejudiced by a mutual mistake in the legal deduction, or by a mutual mistake of his own interest as involved in the question of alienage, and that either should be entitled to the benefit of the real facts on which the question of law depends, so far as they are developed by the evidence in this case, or stated by the opposite party on oath, with actual or presumed knowledge of them.

Richard Smith then, was born a British subject, and as may be assumed, in England, but as early as 1772, he was in Boston, where he married in that year, and from 1773 until long after the treaty of peace, he continued to reside in the United States. Certainly the *prima facie* inference from these facts is, that Richard Smith, continuing to reside within the territory, whose independence of the residue of the empire, and of the original sove-

reignty, was declared in 1776, and recognized by the former sovereign in 1783, had elected to identify himself with the separating portion, its cause and its government; that with it he renounced his native allegiance, and that he, with the rest of the community to which he belonged, was included in the renunciation of the right of allegiance on the part of the former sovereign.

In a revolution, involving a separation of territory, and terminating in the establishment of an independent community in the separating portion, it must necessarily be true, that all persons, inhabitants within that portion, and co-operating in the revolution, as all inhabitants must be supposed to do until the contrary appears, are to be regarded as constituent members of the new community, entitled to its protection against all claim of the original sovereign, founded on the pre-existing right of allegiance, and absolved individually, from all such claim, when the community itself is so absolved. "A declaration that a state shall be free, sovereign, and independent, is a declaration that the people composing the state shall no longer be considered as subjects of the sovereign by whom such a declaration is made." Chief Justice Abbot, in *Doe* vs *Acklam*, 2 *Barn. and Cress.* 779; *Inglis* vs *Sailors Snug Harbor*, 3 *Peters*, 122.

The declaration of independence of 1776, was a renunciation of allegiance to Great Britain, by all the inhabitants of the United Colonies, who did not elect to except themselves from the renunciation, and by the treaty of peace, the King of Great Britain released his claim to the allegiance of all of the people of the states, who then adhered to the new government, whether native Americans or otherwise: *Shanks* vs *Dupont*, 3 *Peters* 247.

In each of the cases above cited, as well as in those of *Orr* vs *Hodgson*, 4 *Wheaton*, 453, *and McIlvaine* vs *Coxe's lessee*, 4 *Cranch*, 211, and others, the right of the inhabitants to elect whether they would adhere to the American or the British cause is expressly or impliedly recognized; and although in the cases in the Supreme Court of the United States, the principle seems generally to have been stated as applying to British subjects born

*Margin note:*

TRIMBLES
*vs*
HARRISON *et al.*

By the treaty of 1794 with Great Britain, that government relinquished all claim to the allegiance of such persons as were resident in the territory of the U. S. at the date of her declaration of independence, and who still adheard to the U. States government—remaining in the U. S. after the treaty is, *prima facie*, adhering.

in America, we can perceive no distinction as to this point between those who were born here, before the revolution, and those born in other portions of the British empire. In the case of *Inglis* vs *Sailors Snug Harbor, supra.* the right of election is extended to both classes of persons, being in the United States, and in the case of *Shanks* vs *Dupont*, it is asserted that both classes of persons were equally included in the treaty of peace and in the renunciation of allegiance therein made. It is also plainly to be implied, from the same cases, and indeed is in some of them asserted, that the continued residence of a British born subject within the United States, from a period before the declaration of independence until long after the treaty of peace, is of itself, in the absence of all countervailing facts, *prima facie* evidence of his election to adhere to the American cause. In *Doe* vs *Acklam, supra.* Chief Justice Abbot considered the treaty of peace as a release from their allegiance, of all British subjects who remained here, and it was certainly so to all who remained here as citizens of the United States. The facts, in addition to those commented on are, that in 1782, when the city of New York was in possession of the British, R. Smith seems to have been a resident there, but when or with what view he went there, or how long he remained, does not appear, but it seems that even then he intended to remove to Connecticut, and it further appears that in January, 1783, he became a member of that state by the concurrent act of himself and the State. So that if his residence in the city of New York, in 1782, is calculated to create some suspicion, that he adhered to the British cause, which is all that it can do, as it appears in this case, his becoming a citizen of the state of Connecticut, before the treaty of peace, is not only sufficient to remove that suspicion, but was in itself, an actual election, which, whatever may have been his previous course or intention, made him one of the people of the United States, owing allegiance to Connecticut, and whose allegiance to Great Britain was released by the treaty. He was then not a subject of Great Britain, but a citizen of the United States, at and after the treaty of peace. And if it were conceded, that

he could a second time, change his character and allegiance by his own election, and if it were further conceded that he might have made and manifested that election by merely removing to and continuing in England, with the intention of becoming and remaining a subject there, still there is no proof of any such removal or intention, as early as 1794, nor of any fact from which either can be inferred. As he was here a citizen in 1783, and afterwards, the presumption prevails that he continued here until he is shown to have been elsewhere; as the presumption also prevails, that he continued to be a citizen of the United States until a renunciation of that character, or something from which it may be implied, is shown. He took his daughter to England prior to the 5th day of July, 1798, where she was married; about the year 1805, he sent out Richard Dixon, an Englishman, to see about this land, and in February, 1818, he died in England, but his daughter and her husband state that he was a citizen of the United States till his death.

It is impossible, from these facts, to say that when the treaty of 1794 took effect, R. Smith was a subject of Great Britain; as a citizen of the United States in 1794, he had no privilege under that treaty to transmit his lands here, or his title to lands here to an heir who, at the time of his death, was an alien; and if, at the time of his death, his daughter, Anne Eyre Dixon, was an alien, she cannot take lands here by descent from him; for the treaty secures no privilege to the alien heirs of American citizens, who held lands here at its date, but to the heirs, British or American, of British subjects who held lands here at that time.

The question then arises, was Anne E. Dixon an American citizen, or was she a British subject at the time of her father's death? Being born at Boston in 1773, she was by birth, a British subject; with the right, however, upon the principles already stated, of changing or retaining that character; being incapacitated, by infancy, from making an election for herself, during the revolution, her election should be considered as having followed the character of her father, subject to the right of disaffirmance in a reasonable time after the termination of her minor-

TRIMBLES
vs
HARRISON et al.

Lands of a citizen of the U. S. do not descend to his child who is an alien. (The treaty of 1794 secures no privilege to the alien heirs of American citizens.)

ity, and her condition was not conclusively decided by the treaty of peace: *Inglis* vs *Sailor's Snug Harbor*, 3 *Peters*, 123–126. Did she disaffirm the election or adhere? The witness, after speaking of the time of her birth says, ''she was subsequently brought to England, by her father, where she was married on the 5th of July, 1798.'' If from this language it is to be implied, as it may be, that she was taken to England during her minority, then, as while there, she was married, when of mature age, to a British subject, and as she has remained there ever since, we should not doubt that these circumstances furnished ample manifestation of her dissent from her father's election for her, and of her adherance to her native allegiance. If she was not taken to England until after she had attained the age of twenty-one years, still her marriage and continued residence there for so long a period, are sufficient evidence of her determination to become a British subject: (*Shanks* vs *Dupont*, *supra.*) these facts may be regarded as manifesting that such was her intention, not only from the time of her going there, but from the time when she was capable of electing for herself to which allegiance she would adhere; and as it may be presumed that her being taken there afforded the first opportunity of decisively manifesting her dissent from her father's election for her, we are of opinion that her disaffirmance must be regarded as having been made within a reasonable time, no matter at what period before her marriage she was taken to England. Had she affirmed the election made for her, the affirmance would have related back, with the same effect as if she had been capable during the revolution, and had then made it herself—as she disafirmed it, her native allegiance was never renounced or released, and she remains as she was born, a British subject; and so we presume she would choose to be regarded, and as we suppose would be regarded in England, if she should survive her husband and claim dower in his lands there. But if we should be mistaken in placing her alienage on the ground of her having disaffirmed her father's election for her, within a reasonable time after the termination of her minority, and if, therefore, she is to be considered as having been once a citizen

of the United States, still the decisive facts remain, that being in England, and of mature age, she there married a British subject, with the prospect, and therefore with the presumed intention of remaining, during life, in that country, and subject to its power, and that she has, for forty years, so remained a subject, in fact, of Great Britain. These facts, as we think, sufficiently demonstrate her intention to renounce her character as an American citizen, and to identify herself, in allegiance as well as in fortune, with her husband and his country. And even in this view of the case, we should, upon the authority of the decision of this Court, in the case of *Alsberry* vs *Hawkins*, 9 *Dana*, 177, pronounce that she had renounced and lost her citizenship, and could not inherit lands in this state upon the death of her father in 1818.

We are of opinion, therefore, that the objection taken to the title of Harrison and of John Dixon and wife, on the ground of the alienage of the said Anne Eyre Dixon, and of her consequent incapacity to inherit lands in this state, from her father, Richard Smith, is valid; and consequently, that so far as appears in this case, there is no title, legal or equitable, in either of the said parties to the 32000 acres of land patented to James Hutchinson, as in the pleadings and exhibits is set forth; and as every part of the relief sought by the original bill of Harrison, and by the cross bills of said Harrison and of said Dixon and wife, depends upon the existence of a legal or equitable title in some of them, which they now only claim as derived by descent from Richard Smith to Anne E. Dixon, it follows, that as there was no such descent, they have each and all failed to establish the right of either to any part of the relief sought, either against the Trimbles for the possession, or against David Trimble for a relinquishment of the title acquired by his recent deed from the heirs of J. Hutchinson, the patentee, and which he received with notice of the prior deed to Richard Smith, or for the specific execution of his four contracts with Harrison for the purchase and conveyance of Hutchinson's title, claimed through said Richard Smith, or against the heirs of said James Hutchinson, for a reconveyance of the said 32000 acres, which is claimed in consequence

*If the child of one born a British subject, and which child is also itself born a British subject, but whose father becomes entitled to citizenship by the treaty of 1794, remove to England, and there, when of full age, marry a British subject, permanently settle, and afterwards the father die, such child cannot take lands by descent from the father, in Ky. it is an election to adhere to Britain, and such an one is an alien—no title passes by the deed of an alien (claiming by descent,) through the father who was a citizen, to lands in Kentucky.*

of the original deed to said R. Smith, never having been recorded. And we are of the opinion that the said Trimbles, being in possession of the land under various claims of title, and the said David having obtained a deed, purporting to convey the title of Hutchinson's heirs, they, and especially the said David, are entitled to contest the complainants right, as well to a decree for a conveyance from Hutchinson's heirs as to the relief sought directly against themselves or either of them, and that in showing that Richard Smith's title, whatever it was, did not descend to Anne E. Dixon, they show that neither Harrison nor Dixon and wife are entitled to a reconveyance from said heirs, on account of the deed of their ancestor being unrecorded, or to a decree ordering the said deed to be now recorded. It is to be understood, however, that in placing the failure of the complainants title, and of this suit, upon the ground of the alienage of Anne E. Dixon, we do not intend to intimate that all of the other objections taken to the title or to the right to maintain this suit, are unsustainable.

But because the said Harrison and John Dixon and wife have failed to show title, legal or equitable, to the lands or any part thereof, in the original bill mentioned, either in themselves or in Richard Smith, whose conveyance to D. Trimble, together with their own, is tendered in one of the cross bills of Harrison, the decree rendered in favor of said Harrison is erroneous, and is therefore reversed and the cause remanded, with directions to dismiss the bill and cross bills of said Harrison, and the cross bill of said John Dixon and wife, which will also dispose of so much of Trimbles' bills and cross bills against them, or either of them, as relates to the objections made to their title, and the specific execution of the four contracts between said D. Trimble and said Harrison.

But as the said D. Trimble has not, in any of his said bills or cross bills, prayed for a decree against the said Harrison and said J. Dixon and wife, either for a rescission of any of the said contracts, or for the refunding of the money which appears to have been coerced from him under a judgment upon one of said contracts, so

that his right to a rescission or repayment has not been litigated, we do not now decide upon it; and as his bill for an injunction against the judgment aforesaid, filed on the 28th day of October, 1837, and which, together with another bill previously filed by him, was consolidated with the suit on Harrison's bill, prays for general relief, upon which prayer the question of rescission, &c. might be litigated if desirable that it should be done: and as, in consequence of the non-residence of Harrison and of J. Dixon and wife, made defendants in said bill, there might, as suggested therein, be great difficulty in the remedy, either for a rescission of the contracts or for the repayment of the money, if the bill was dismissed without prejudice, therefore the cause, upon that bill, is remanded for further proceedings. And the cause, upon the bills and cross bills of the said Trimbles, and each of them, against all other persons, except the said Harrison and J. Dixon and wife, will also be open in the Circuit Court for further proceedings, and is not, in any manner, decided on in this opinion.

*Owsley*, *Trimble*, *Hord*, and *Apperson* for plaintiffs: *W. R. Beatty* for defendants.