THE CITIZENSHIP OF A PERSON BORN IN THE UNITED STATES OF CHINESE PARENTS.

*In re* LOOK TIN SING, on *Habeas Corpus.*

(*Circuit Court, D. California.* September 29, 1884.)

1. CITIZENSHIP OF PERSONS BORN IN THE UNITED STATES OF CHINESE PARENTS.
   A person born within the United States, of Chinese parents residing therein, and not engaged in any diplomatic or official capacity under the emperor of China, is a citizen of the United States.

2. CONSTRUCTION OF WORDS "SUBJECT TO JURISDICTION THEREOF," IN FIRST CLAUSE OF SECTION 1 OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION.
   Persons are subject to the jurisdiction of the United States who are within their dominions and under the protection of their laws, with the consequent obligation to obey them when obedience can be rendered: but only those who are thus subject by their birth or naturalization are within the terms of the amendment. The jurisdiction over these latter must, at the time, be both actual and exclusive. Persons excepted from citizenship, notwithstanding their birth or naturalization in the United States.

3. ORIGIN OF THE CLAUSE IN THE AMENDMENT DECLARING WHO ARE CITIZENS OF THE UNITED STATES.
   Previous to this amendment the general doctrine, except as applied to Africans brought here and sold as slaves, and their descendants, was that birth within the dominions and jurisdiction of the United States of itself created citizenship. The amendment was adopted as an authoritative declaration of this doctrine as to the white race, and also to do away with the exception as to Africans and their descendants.

4. THE RESTRICTION ACTS NOT APPLICABLE TO CITIZENS.
   The acts of congress of 1882 and 1884, restricting the immigration of Chinese laborers to the United States, are not applicable to citizens of the United States, though of Chinese parentage. No citizen can be excluded from the United States except in punishment for crime.

On *Habeas Corpus.*

*T. D. Riordan* and *William M. Stewart,* for petitioner.

*S. G. Hilborn,* U. S. Atty., *Carroll Cook,* Asst. U. S. Atty., and *John N. Pomeroy,* for the United States.

Before FIELD, Justice, and SAWYER and SABIN, JJ.[1]

FIELD, Justice. The petitioner belongs to the Chinese race, but he was born in Mendocino, in the state of California, in 1870. In 1879

---

[1] Judge HOFFMAN did not sit on the hearing of this case, but he was on the bench when the opinion was delivered, and concurred in the views expressed.

he went to China, and returned to the port of San Francisco during the present month, (September, 1884,) and now seeks to land, claiming the right to do so as a natural-born citizen of the United States. It is admitted by an agreed statement of facts that his parents are now residing in Mendocino, in California, and have resided there for the last 20 years; that they are of the Chinese race, and have always been subjects of the emperor of China; that his father sent the petitioner to China, but with the intention that he should return to this country; that the father is a merchant at Mendocino, and is not here in any diplomatic or other official capacity under the emperor of China. The petitioner is without any certificate under the act of 1882 or of 1884, and the district attorney of the United States, intervening for the government, objects to his landing for the want of such certificate.

The first section of the fourteenth amendment to the constitution declares that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the state wherein they reside." This language would seem to be sufficiently broad to cover the case of the petitioner. He is a person born in the United States. Any doubt on the subject, if there can be any, must arise out of the words. *"subject to the jurisdiction thereof."* They alone are subject to the jurisdiction of the United States who are within their dominions and under the protection of their laws, and with the consequent obligation to obey them when obedience can be rendered; and only those thus subject by their birth or naturalization are within the terms of the amendment. The jurisdiction over these latter must, at the time, be both actual and exclusive. The words mentioned except from citizenship children born in the United States of persons engaged in the diplomatic service of foreign governments, such as ministers and ambassadors, whose residence, by a fiction of public law, is regarded as part of their own country. This ex-territoriality of their residence secures to their children born here all the rights and privileges which would inure to them had they been born in the country of their parents. Persons born on a public vessel of a foreign country, while within the waters of the United States, and consequently within their territorial jurisdiction, are also excepted. They are considered as born in the country to which the vessel belongs. In the sense of public law, they are not born within the jurisdiction of the United States. The language used has also a more extended purpose. It was designed to except from citizenship persons who, though born or naturalized in the United States, have renounced their allegiance to our government, and thus dissolved their political connection with the country. The United States recognize the right of every one to expatriate himself and choose another country. This right would seem to follow from the greater right proclaimed to the world in the memorable document in which the American colonies declared their independence

and separation from the British crown, as belonging to every human being,—God-given and inalienable,—the right to pursue his own happiness. The English doctrine of perpetual and unchangeable allegiance to the government of one's birth, attending the subject wherever he goes, has never taken root in this country, although there are judicial *dicta* that a citizen cannot renounce his allegiance to the United States without the permission of the government under regulations prescribed by law; and this would seem to have been the opinion of Chancellor KENT when he published his Commentaries. But a different doctrine prevails now. The naturalization laws have always proceeded upon the theory that any one can change his home and allegiance without the consent of his government; and we adopt as citizens those belonging to our race who, coming from other lands, manifest attachment to our institutions, and desire to be incorporated with us. So profoundly convinced are we of the right of these immigrants from other countries to change their residence and allegiance, that, as soon as they are naturalized, they are deemed entitled with the native-born to all the protection which the government can extend to them, wherever they may be, at home or abroad. And the same right which we accord to them to become citizens here, is accorded to them as well as to the native-born, to transfer their allegiance from our government to that of other states.

In an opinion of Atty. Gen. Black, in the case of a native Bavarian, who came to this country, and, after being naturalized, returned to Bavaria, and desired to resume his *status* as a Bavarian, this doctrine is maintained. "There is," he says, "no statute or other law of the United States which prevents either a native or naturalized citizen from severing his political connection with this government, if he sees proper to do so in time of peace, and for a purpose not directly injurious to the interests of the country. There is no mode of renunciation prescribed. In my opinion, if he emigrates, carries his family and effects with him, manifests a plain intention not to return, takes up his permanent residence abroad, and assumes the obligation of a subject to a foreign government, this would imply a dissolution of his previous relations with the United States, and I do not think we could or would afterwards claim from him any of the duties of a citizen." 9 Op. Attys. Gen. 62. The doctrine thus stated has long been received in the United States as a settled rule of public law; and in the treaty of 1868, between China and this country, the right of man to change his home and allegiance is recognized as "inherent and inalienable." 16 St. p. 740, art. 5. And in the recital of an act of congress, passed nearly at the same time with the signing of the treaty, this right is assumed to be "a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness;" and in the body of the act, "any declaration, instruction, opinion, order, or decision of any officers of this government which denies, restricts, impairs, or ques-

tions the right of expatriation" is declared to be "inconsistent with the fundamental principles" of our government. 13 St. 223; Rev. St. § 1999.[1] So, therefore, if persons born or naturalized in the United States have removed from the country, and renounced, in any of the ordinary modes of renunciation, their citizenship, they thenceforth cease to be subject to the jurisdiction of the United States.[2]

With this explanation of the meaning of the words in the fourteenth amendment, "subject to the jurisdiction thereof," it is evident that they do not exclude the petitioner from being a citizen. He is not within any of the classes of persons excepted from citizenship, and

[1]The treaty was signed on the twenty-eighth of July, 1868. The following act of congress was approved the twenty-seventh of the same month:

CHAPTER CCXLIX.—*An Act Concerning the Rights of American Citizens in Foreign States.*

Whereas, the right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness; and whereas, in the recognition of this principle this government has freely received emigrants from all nations and invested them with the rights of citizenship; and whereas, it is claimed that such American citizens, with their descendants, are subjects of foreign states, owing allegiance to the governments thereof; and whereas, it is necessary, to the maintenance of public peace, that this claim of foreign allegiance should be promptly and finally disavowed; therefore,—

Be it enacted by the senate and house of representatives of the United States of America, in congress assembled, that any declaration, instruction, opinion, order, or decision of any officers of this government which denies, restricts, impairs, or questions the right of expatriation is hereby declared inconsistent with the fundamental principles of this government.

Sec. 2. And be it further enacted, that all naturalized citizens of the United States, while in foreign states, shall be entitled to, and shall receive from this government, the same protection of persons and property that is accorded to native-born citizens in like situations and circumstances.

Sec. 3. And be it further enacted, that whenever it shall be made known to the president that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the president forthwith to demand of that government the reasons for such imprisonment, and if it appears to be wrongful, and in violation of the rights of American citizenship, the president shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, it shall be the duty of the president to use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate such release, and all the facts and proceedings relative thereto shall, as soon as practicable, be communicated by the president to congress.

Approved July 27, 1868.

The provisions of this statute are re-enacted in the Revised Statutes, in sections 1999, 2000, and 2001.

[2]Many other cases might be mentioned where persons would not be citizens, though born in the country. Thus, as Kent says: "If a portion of the country be taken and held by conquest in war, the conqueror acquires the rights of the conquered as to its dominion and government, and children born in the armies of a state while abroad and occupying a foreign country are deemed to be born in the allegiance of the sovereign to whom the army belongs." 2 Comm. 42. By allegiance, as thus used, is meant the duty of obedience to the government or sovereign under which the children live for the protection they receive. But while they are in their infancy they cannot, of course, perform that duty, and its performance must necessarily be respited until they arrive at the years of discretion and responsibility. They then owe obedience, not only for the protection then enjoyed, but, as observed

the jurisdiction of the United States over him at the time of his birth was exclusive of that of any other country.

The clause as to citizenship was inserted in the amendment not merely as an authoritative declaration of the generally recognized law of the country, so far as the white race is concerned, but also to overrule the doctrine of the *Dred Scott Case*, affirming that persons of the African race brought to this country and sold as slaves, and their descendants, were not citizens of the United States, nor capable of becoming such. 19 How. 393. The clause changed the entire *status* of these people. It lifted them from their condition of mere freedmen, and conferred upon them, equally with all other native-born, the rights of citizenship. When it was adopted, the naturalization laws of the United States excluded colored persons from becoming citizens, and the freedmen and their descendants, not being aliens, were without the purview of those laws. So the inability of persons to become citizens under those laws in no respect impairs the effect of their birth, or of the birth of their children, upon the *status* of either as citizens under the amendment in question.

Independently of the constitutional provision, it has always been the doctrine of this country, except as applied to Africans brought here and sold as slaves, and their descendants, that birth within the dominions and jurisdiction of the United States of itself creates citizenship. This subject was elaborately considered by Assistant Vice-chancellor SANDFORD in *Lynch* v. *Clarke*, found in the first volume of his reports. [1 Sandf. 583.] In that case one Julia Lynch, born in New York in 1819, of alien parents, during their temporary sojourn in that city, returned with them the same year to their native country, and always resided there afterwards. It was held that she was a citizen of the United States. After an exhaustive examination of the law, the vice-chancellor said that he entertained no doubt that every person born within the dominions and allegiance of the United States, whatever the situation of his parents, was a natural-born citizen; and added that this was the general understanding of the legal profession, and the universal impression of the public mind. In illustration of this general understanding he mentions the fact that when at an election an inquiry is made whether the person offering to vote is a citizen or an alien, if he answers that he is a native of this country the answer is received as conclusive that he is a citizen;

by Judge WILSON, for that which they have received from their birth. 1 Wils. Works, 313. By being born within the allegiance of a government is only meant being born within the protection of its laws, with a consequent obligation to obey them when obedience can be rendered. So, also, as to members of the Indian tribes within the limits of the United States. These tribes are independent political communities, retaining, in many respects, the right of self-government, notwithstanding they are under the protecting power of the United States; and a member thereof, though born in the country, is not, by his birth, a citizen of the United States, under the fourteenth amendment. He is not born under their actual and exclusive jurisdiction, which the amendment contemplates. *McKay* v. *Campbell*, 2 Sawy. 118; *U. S.* v. *Osborne*, 6 Sawy. 406; *Worcester* v. *Georgia*, 6 Pet. 515.

that no one inquires further; no one asks whether his parents were citizens or foreigners. It is enough that he was born here, whatever was the *status* of his parents. He shows, also, that legislative expositions on the subject speak but one language, and he cites to that effect not only the laws of the United States, but the statutes of a great number of the states, and establishes conclusively that there is on this subject a concurrence of legislative declaration with judicial opinion, and that both accord with the general understanding of the profession and of the public.[1]

Whether it be possible for an alien who could be naturalized under our laws to renounce for his children while under the age of majority the right of citizenship, which, by those laws, he could acquire for them, it is unnecessary to consider, as no such question is presented here. Nor is the further question before us whether, if he cannot become a citizen, he can, by his act, release any right conferred upon them by the constitution.

As to the position of the district attorney, that the restriction act prevents the re-entry of the petitioner into the United States, even if he be a citizen, only a word is necessary. The petitioner is the son of a merchant, and not a laborer, within the meaning of the act. Being a citizen, the law could not intend that he should ever look to the government of a foreign country for permission to return to the United States,[2] and no citizen can be excluded from this country ex-

---

[1] In 1855 congress passed the following act, securing citizenship to children of citizens of the United States born without their limits:

CHAPTER LXXI.—*An Act to Secure the Right of Citizenship to Children of Citizens of the United States Born out of the Limits thereof.*

Be it enacted by the senate and house of representatives of the United States of America, in congress assembled, that persons heretofore born, or hereafter to be born, out of the limits and jurisdiction of the United States, whose fathers were, or shall be, at the time of their birth, citizens of the United States, shall be deemed and considered, and are hereby declared to be, citizens of the United States: provided, however, that the rights of citizenship shall not descend to persons whose fathers never resided in the United States.

Sec. 2. And be it further enacted, that any woman who might lawfully be naturalized under the existing laws, married, or who shall be married, to a citizen of the United States, shall be deemed and taken to be a citizen.

Approved February 10, 1855.

. The provisions of this statute are re-enacted in the Revised Statutes, in sections 1993 and 1994.

[2] The restriction act of congress of July 5, 1884, amending the act of May 6, 1882, "to execute certain treaty stipulations relating to Chinese," provides that every Chinese person other than a laborer entitled to enter the United States, under the treaty between our government and China, or under that act, shall obtain from the Chinese government, or the government of which he is a subject, its permission to come within the United States, authenticated by its certificate, containing various particulars of himself and family so as to clearly identify him; and while such certificate is only *prima facie* evidence against our government, it is made the sole evidence permissible on the part of the person producing it to establish his right of entry into the United States. Chapter 220, § 6, St. 1883-84, p. 115.

cept in punishment for crime. Exclusion for any other cause is unknown to our laws, and beyond the power of congress. The petitioner must be allowed to land; and it is so ordered.