[S. F. No. 6465. In Bank.—August 5, 1913.]

ETHEL C. MACKENZIE, Petitioner, v. JOHN P. HARE et al., as the Board of Election Commissioners of the City and County of San Francisco, Respondents.

CITIZENSHIP—STATUS DETERMINED BY FEDERAL CONSTITUTION AND STATUTES.—The *status* of persons as citizens of the United States or aliens, respectively, is controlled entirely by the constitution of the United States and the acts of Congress passed in pursuance thereof, and in determining their meaning and effect the state courts are bound by the interpretation put upon them by the courts of the United States.

ID.—EXPATRIATION PERMITTED BY FEDERAL STATUTES.— The act of Congress of July 26, 1868 (15 U. S. Stats. 223, U. S. Rev. Stats., sec. 1999), the preamble of which declares that the right of expatriation is a natural and inherent right of all people, and the body of which further declares that any decision of any officer of the government denying, restricting, or impairing the right of expatriation is "inconsistent with the fundamental principles of this government," is operative to the extent that it gives the consent of the national government to the expatriation of any citizen by his or her voluntary act. If such consent of the nation is essential to a valid expatriation, this law is evidence thereof. The absolute right of expatriation is now recognized as the settled doctrine of this country.

ID.—CONTROL OF CONGRESS OVER NATURALIZATION AND EXPATRIATION.— The entire subject of naturalization and expatriation, including the method by which each might or could be accomplished and manifested, is a matter within the exclusive control of Congress.

ID.—MARRIAGE OF ALIEN WOMAN TO CITIZEN.—Under the act of Congress of 1855 (10 U. S. Stats. 604; U. S. Rev. Stats. 1994), every alien woman who marries a citizen of the United States becomes perforce a citizen herself, without the formality of naturalization and regardless of her wish in that respect.

ID.—MARRIAGE OF FEMALE CITIZEN TO ALIEN—LOSS OF CITIZENSHIP— WOMAN TAKES NATIONALITY OF HUSBAND—ACT OF CONGRESS OF MARCH 2, 1907.—The act of Congress of March 2, 1907 (34 U. S. Stats. 1228), now controls the subject of expatriation, and under section 3 thereof, a woman citizen of the United States by birth, who, after the passage of that act, married an alien, thereupon took the nationality of her husband and ceased to be a citizen of the United States, whether she intended that result as a consequence of her marriage or not. This results although the woman was married in this country to an alien permanently residing therein, and she and he continued to reside there.

ID.—WOMAN WHO HAS LOST CITIZENSHIP BY MARRIAGE TO ALIEN NOT ENTITLED TO VOTE.—A woman who has lost her United States citizenship by such a marriage, is not entitled to vote, under section 1 of article II of the state constitution, as amended on October 10, 1911, which extends the privilege of suffrage to "every native citizen of the United States."

ID.—CONSTITUTIONAL LAW—FOURTEENTH AMENDMENT DOES NOT FORBID EXPATRIATION.—That act of Congress is not in contravention with the provision of the fourteenth amendment of the federal constitution declaring that "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside." That provision does not forbid expatriation nor take from Congress the power to legislate concerning it.

ID.—MARRIAGE TO ALIEN PRIOR TO ACT OF 1907.—The question of the effect of the marriage of a native female citizen to an alien, where such marriage had taken place before the passage of said act of Congress of 1907, is not decided.

APPLICATION for a Writ of Mandate directed to the Board of Election Commissioners of the City and County of San Francisco.

The facts are stated in the opinion of the court.

Milton T. U'Ren, for Petitioner.

Thomas V. Cator, and Wm. McDevitt, for Respondents.

SHAW, J.—Application in this court for a writ commanding defendants, as members of the board of election commissioners of the city and county of San Francisco, to register the plaintiff as a qualified voter of said city and county.

The plaintiff was born and ever since has resided in the state of California. On August 14, 1909, being then a resident and citizen of this state and of the United States, she was lawfully married to Gordon Mackenzie, a native and subject of the kingdom of Great Britain. He had resided in California prior to that time, still resides here and it is his intention to make this state his permanent residence. He has not become naturalized as a citizen of the United States and it does not appear that he intends to do so. Ever since their marriage the plaintiff and her husband have lived together as husband and wife. On January 22, 1913, she applied to the defendants to be registered as a voter. She was then over the age of twenty-one years and had resided in San Francisco for more than ninety days.

Registration was refused to her on the ground that by reason of her marriage to Gordon Mackenzie, a subject of Great Britain, she thereupon took the nationality of her husband and ceased to be a citizen of the United States. The soundness of this objection is the question to be decided.

The qualifications necessary to entitle a person to the privilege of suffrage and the right of registration as a voter in this state are fixed, declared, and controlled by section 1 of article II of the state constitution as amended on October 10, 1911.

The purpose of the amendment was to extend the privilege of suffrage to women. The portion of the section upon which the decision of this case depends is the opening clause, giving the privilege of suffrage to "every native citizen of the United States," who possesses the other qualifications mentioned in the subsequent parts of the section. It declares that persons having the qualifications stated shall "be entitled to vote at all elections." As it is admitted that the plaintiff possesses all the other qualifications required, the sole question presented is whether or not, upon the facts we have stated, she is a "native citizen of the United States." If she comes within that definition she is entitled to registration as demanded.

She was a citizen of the United States prior to her marriage to Mackenzie. No event affecting her *status* as a citizen, except said marriage, has occurred since that time. She therefore still remains a citizen of the United States unless she has lost her citizenship by her marriage with an unnaturalized resident alien. (*Hauenstein* v. *Lynham,* 100 U. S. 484, [25 L. Ed. 628].)

The *status* of persons as citizens or aliens, respectively, is controlled entirely by the constitution of the United States and the acts of Congress passed in pursuance thereof. We must look solely to them to ascertain whether or not the plaintiff is a citizen and as such a voter entitled to registration. And in determining their meaning and effect the state courts are bound by the interpretation put upon them by the courts of the United States.

Prior to any legislation on the subject by Congress there was some uncertainty and conflict of authority concerning the right of expatriation. The question first arose in 1795, in *Talbot* v. *Jansen,* 3 U. S. (Dall.) 133, 162, [1 L. Ed. 540], where Iredell, J., discusses it at length, stating his conclusion to be that a citizen could not denationalize himself without the consent of his government. The other justices expressed no opinion on the point. Similar views were stated in *Shanks* v. *Dupont* (1830), 3 Pet. 246, [7 L. Ed. 666]; *Inglis* v. *Sailors Snug Harbour* (1830), 3 Pet. 101, 125, [7 L. Ed. 617]; and in *United States* v. *Gillies* (1815), Pet. C. C. 161, [Fed. Cas. No. 15,206]. In *Shanks* v. *Dupont,* the court said, per Story, J.: "The general doctrine is, that no person can, by any act of their own, without the consent of their government, put off

their allegiance, and become aliens.'' And on this ground it was held that the marriage of a woman citizen with an alien did not change her allegiance to the United States. There was, at that time, no legislation permitting expatriation. In *Stoughton* v. *Taylor,* 2 Paine C. C. 661, [Fed. Cas. No. 7558], it is said that the right of expatriation is fundamental and inherent. To the same effect see *Alsberry* v. *Hawkins,* 39 Ky. (1 Dana), 178, [33 Am. Dec. 546]. Other state courts were of the same opinion. The denial of the right of voluntary expatriation was somewhat inconsistent with the laws of the United States providing for the naturalization of foreigners, the first of which was enacted in 1779 (1 U. S. Stats. 103). The question was practically set at rest by the act of July 26, 1868 (15 U. S. Stats. 223; U. S. Rev. Stats., sec. 1999, [U. S. Comp. Stats. 1901, p. 1269, 1 Fed. Stats. Ann., p. 788]). The preamble thereof declares that the right of expatriation is a natural and inherent right of all people. The body of the act declares further that any decision of any officer of the government denying, restricting, or impairing the right of expatriation is "inconsistent with the fundamental principles of this government." This language seems to be but little more than a legislative declaration of national policy. But it clearly is operative in this, that it gives the consent of the national government to the expatriation of any citizen by his or her voluntary act. If such consent of the nation is essential to a valid expatriation, this law is evidence thereof. The absolute right of expatriation is now recognized as the settled doctrine of this country. (*Browne* v. *Dexter,* 66 Cal. 40, [4 Pac. 913]; *Kane* v. *McCarthy,* 63 N. C. 302; *Burton* v. *Burton* (N. Y.), 1 Keyes, 359; 1 Abb. Dec. 271; *Kelly* v. *Owen,* 74 U. S. 496, [19 L. Ed. 283]; *In re Look Tin Sing,* 21 Fed. 905.) In the case last cited the court says: "The United States recognize the right of every one to expatriate himself and choose another country." In view of the contention to be hereafter mentioned, it is to be noticed that this case was decided after the adoption of the fourteenth amendment.

The first legislation by Congress in regard to the *status* of married women as citizens was the act of 1855. (10 U. S. Stats. 604; U. S. Rev. Stats. sec. 1994, [U. S. Comp. Stats. 1901, p. 1268, 1 Fed. Stats. Ann., p. 786].) Section 2 is as follows: "That any woman who might lawfully be naturalized

under the existing laws, married, or who shall be married to a citizen of the United States, shall be deemed and taken to be a citizen." In the Revised Statutes the words "and taken" are omitted. The effect of this statute is that every alien woman who marries a citizen of the United States becomes perforce a citizen herself, without the formality of naturalization and regardless of her wish in that respect. (*Kane* v. *McCarthy,* 63 N. C. 302; *Kelly* v. *Owen,* 74 U. S. 496, [19 L. Ed. 283].) It is not entirely certain that, under our state constitution, such citizenship would entitle such foreign-born woman to vote. Our constitution confers that privilege only on three classes of persons: 1. Native citizens; 2. Those who became citizens under the treaty of Queretaro, or, as it is commonly called, the treaty of Guadalupe-Hidalgo, and, 3. Naturalized citizens. An alien woman who marries a citizen thereby herself becomes a citizen, but there may be doubt if she thereby becomes a naturalized citizen within the meaning of the constitution. This is, of course, a question not here involved. We mention it only to call attention to the distinction and to make it clear that we have not decided it.

The act of 1855 determines the citizenship of an alien woman who marries a citizen. We have in this case the converse of the proposition; the effect of the marriage of a native female citizen to a man who is not a citizen, but is a subject of some other country. In *Pequignot* v. *Detroit* (1883), 16 Fed. 211, Judge Brown, afterward justice of the United States supreme court, decided that an alien woman who had become a citizen under the aforesaid act of 1855 by marrying a citizen, and who was divorced from that husband and thereafter married an unnaturalized alien, lost her citizenship by the last marriage and again became an alien, although both she and her last husband continued to reside in this country with the intention of remaining. In *Ruckgaber* v. *Moore,* 104 Fed. 947, decided in 1900, the court held that a native woman who marries a French citizen and thereafter resides with him in France thereby loses her American citizenship and becomes a citizen of France, adding, however, that to accomplish this result she must, by residence abroad, or other equivalent act, express her intention to renounce her former citizenship by her marriage. Similar views were expressed in *Trimbles* v. *Harrison,* 40 Ky. 147. In *Comitis* v. *Parkerson,* 56 Fed. 556,

[22 L. R. A. 148], decided in 1893, the court held that a native born woman who had married an alien subject of Italy, permanently residing in the United States and intending to continue therein, did not thereby lose her citizenship but remained a citizen of this country. The court said that the power to declare how the right of expatriation should be exercised, as well as that of naturalization, was exclusively in Congress, that expatriation could not take place without the consent of the United States, and that "Congress has made no law authorizing any implied renunciation of citizenship." It was mainly on this ground that the court rested its conclusion, although it was also said that in the absence of any law of Congress as to the method of expatriation, it could not be said to take place, unless it was manifested by a removal from this country and a residence elsewhere. (See, also, *Beck* v. *McGillis,* 9 Barb. (N. Y.) 49; *Shanks* v. *Dupont,* 3 Pet. (U. S.) 246, [7 L. Ed. 666]; *Jennes* v. *Landes,* 84 Fed. 74; *Kreitz* v. *Behrensmeyer,* 125 Ill. 197, 198, [8 Am. St. Rep. 349, 17 N. E. 232].)

When an alien and a citizen intermarry, they not infrequently return to reside, either temporarily or permanently, to the country of the alien spouse, thereby giving rise to questions concerning their rights as citizens or aliens of the respective countries, from which there have ensued international disputes to be discussed and settled by diplomatic correspondence between the United States and the foreign country. The fact that the courts of this country have held variant opinions on some phases of the subject had caused some perplexity in the state department and like diversity of opinions had appeared from time to time in the correspondence of that department. All the courts have agreed, however, that the entire subject of naturalization and expatriation, including the method by which each might or could be accomplished and manifested, is a matter within the exclusive control of Congress. Under these conditions, the United States Senate, on April 13, 1906, passed a joint resolution for the appointment of a commission to "examine into the subjects of citizenship of the United States, expatriation, and protection abroad," and make a report with proposals for legislation thereon. In June, 1906, the house committee on foreign affairs, to which this resolution had been referred, requested the secretary of state to select three men connected with the state department,

familiar with the subject, to investigate and make the desired
report and recommendations. In pursuance of this request
Honorable Elihu Root, then secretary of state, directed Mr.
James B. Scott, solicitor for the department of state; Mr.
David Jaynes Hill, then minister to The Netherlands, and
Mr. Gaillard Hunt, chief of the passport bureau, to make an
inquiry, report, and proposals for legislation, as requested.
These gentlemen proceeded and on December 18, 1906, they
made an elaborate and exhaustive report of 538 pages, with
recommendations for legislation covering all the phases of the
subject except that of naturalization, which was already pro-
vided for. With this document before it, Congress framed
an act which became a law on March 2, 1907. (34 U. S.
Stats. 1228, [U. S. Comp. Stats. 1911, p. 490, Fed. Stats. Ann.
(Supp. 1909), p. 69].) This act now controls the subject
referred to, including that involved in this case. Section 3
thereof is practically decisive of the case before us and it is
as follows:

"That any American woman who marries a foreigner shall
take the nationality of her husband. At the termination of
the marital relation she may resume her American citizenship,
if abroad, by registering as an American citizen within one
year with a consul of the United States, or by returning to
reside in the United States, or, if residing in the United States
at the termination of the marital relation, by continuing to
reside therein."

There is no escape from the conclusion that, under the pro-
visions of this section, the plaintiff in this case, when she mar-
ried Gordon Mackenzie, a British subject, thereupon took the
nationality of her husband and ceased to be a citizen of the
United States. Just as an alien woman who marries a citizen
becomes a citizen herself, whether she wishes it or not, as the
cases we have cited declare, so a female citizen who marries
an alien becomes herself an alien, whether she intends that
result as the consequence of her marriage or not. She
must bow to the will of the nation as expressed by the act of
Congress. Owing to the possibility of international compli-
cations, the rule has generally prevailed, from considerations
of policy, that the wife should not have a citizenship, nor an
allegiance, different from that of her husband. The section
aforesaid was intended to put this general doctrine into statu-

tory form. When, after Congress by this act had declared
that her marriage to an alien would accomplish her expatria-
tion, she thereafter married an alien, she is conclusively pre-
sumed to have intended thereby to renounce her citizenship
of the United States and become a subject of Great Britain.

It is suggested that the object of the act, as expressed in
its title, was to legislate solely for the protection of citizens
abroad and therefore that it should not be construed to apply
to women who marry here and continue to reside in this coun-
try, or who marry an alien permanently residing in this coun-
try. As has been stated in reciting the origin of the act,
such persons frequently remove to the country of which the
husband is a subject, or to other foreign countries. It was the
obvious purpose to provide a rule which should govern in
cases of that kind. Furthermore, the language of the section
shows that it contemplates that an American *woman* included
within its terms will in some cases reside in the United States
after contracting the marriage with the alien, and that it in-
tends that she shall continue to have the nationality of her
husband during such residence here, so long as the marriage
relation continues. The interpretation contended for would
be contrary to this provision, and therefore it is not permis-
sible.

Plaintiff's counsel also contends that the act of Congress is
contrary to the opening sentence of the fourteenth amendment
to the constitution of the United States declaring that "All
persons born or naturalized in the United States, and subject
to the jurisdiction thereof, are citizens of the United States
and of the state wherein they reside." In support of this
position they cite *In re Look Tin Sing,* 21 Fed. 905, and
*United States* v. *Wong Kim Ark,* 169 U. S. 649, [42 L. Ed.
890, 18 Sup. Ct. Rep. 456]. In the first mentioned case,
which was decided in 1884, Justice Field of the United States,
supreme court, writing the decision for the circuit court of
the United States for the district of California, held that a
person born in the United States, of Chinese parents residing
therein at the time of his birth and not members of the diplo-
matic force of China, was a native citizen of the United States
and was not subject to the act of Congress forbidding the
re-entry into this country of Chinese who had returned tem-
porarily to China, except where they had obtained a certificate

allowing such return. This decision declares that a native born person of any race is a citizen, under the aforesaid provision of the fourteenth amendment, and it follows the familiar rule that such person remains a citizen so long as he chooses, provided he does no act which under our laws will have the effect of renouncing or forfeiting such citizenship. The Chinese-Exclusion Act, it was held, did not affect the right of citizenship. But the quotation we have already given from this case shows that the court did not intend to hold and did not hold that the fourteenth amendment forbids expatriation, or takes from Congress the power to legislate concerning it. In *United States* v. *Wong Kim Ark,* the same question was involved and the same conclusion was reached. In the course of its very elaborate discussion of the proposition that the fourteenth amendment affirms the "ancient and fundamental rule of citizenship by birth within the territory" (p. 693 of 169 U. S.), the court said (p. 703) : "The power of naturalization, vested in Congress by the constitution, is a power to confer citizenship, not a power to take it away." From this remark it is argued that a native born citizen cannot, since the adoption of that amendment, renounce his citizenship. But this by no means follows : The court in the quoted sentence was speaking of the power of Congress to deprive a person of his citizenship without his consent and for no sufficient or reasonable cause. In the next paragraph of the opinion the court says (p. 704) : "Upon the facts agreed in this case, the American citizenship which Wong Kim Ark acquired by birth within the United States has not been lost or taken away by anything happening since his birth. No doubt he might himself, after coming of age, renounce this citizenship, and become a citizen of the country of his parents or of any other country." Thus the opinion relied on itself recognizes and declares that citizenship may be renounced, notwithstanding the provisions of the fourteenth amendment. As we have held that the act of the plaintiff here in marrying an alien was in effect a renunciation of her citizenship, it follows that she is not prevented from committing this act of expatriation by the aforesaid provision of the fourteenth amendment.

We think it advisable to state here that the question of the effect of the marriage of a native female citizen to an alien,

where such marriage had taken place before the passage of the act of 1907 aforesaid, is a question not involved in this case. It is not therefore to be deemed as a decision upon the question whether the section of the act of Congress above quoted was applicable to and operated upon citizens of the United States who were at that time married to alien husbands. From what we have said the conclusion is clear that the plaintiff here is not now a citizen of the United States within the meaning of the act of Congress above quoted, and as that act controls the question of her citizenship, and her right to vote is made by our constitution, as amended in 1911, dependent upon her *status* as a citizen of the United States, and does not exist unless she is such citizen, she is not entitled to the exercise of the privilege of suffrage and cannot demand registration as a voter.

It is ordered that the writ applied for be denied.

Angellotti, J., Lorigan, J., Sloss, J., Melvin, J., Henshaw, J., and Beatty, C. J., concurred.

Rehearing denied.