### In re WONG KIM ARK.

(District Court, N. D. California.   January 3, 1896.)

No. 11,198.

CITIZENSHIP—CHILD OF CHINESE PARENTS.
     A person born within the limits of the United States, whose father and mother were both persons of Chinese descent, and subjects of the emperor of China, but, at the time of the birth, were both domiciled residents of the United States, is a citizen of the United States, within the meaning of the fourteenth amendment to the constitution of the United

States. In re Look Tin Sing, 21 Fed. 905, 10 Sawy. 353, and Gee Fook Sing v. U. S., 1 C. C. A. 211, 49 Fed. 146, 7 U. S. App. 27, followed.

Petition for a Writ of Habeas Corpus. Petition granted, and petitioner, Wong Kim Ark, discharged.

Thos. D. Riordan and Napthaly, Friedenreich & Ackerman, for petitioner.

H. S. Foote, U. S. Dist. Atty., and Geo. D. Collins, as amicus curiæ, for the United States.

MORROW, District Judge. A petition for a writ of habeas corpus was filed on behalf of Wong Kim Ark, alleging that said Wong Kim Ark is unlawfully confined and restrained of his liberty on board of the steamship Coptic, and prevented from landing into the United States, by John H. Wise, collector of customs at the port of San Francisco, and D. D. Stubbs, general manager of the Occidental & Oriental Steamship Company, acting under his authority. It is averred, further, that Wong Kim Ark has the right to enter the United States, because he was born within the United States, and is a citizen thereof. The district attorney has intervened on behalf of the United States, and objects to the discharge of Wong Kim Ark, upon the grounds that, although born within the United States, he is not, under the laws of the United States, a citizen thereof, for the reason that his father and mother were, at the time of his birth, and now are, Chinese persons, and subjects of the emperor of China, and that, therefore, Wong Kim Ark is also a Chinese person, and a subject of the emperor of China; that he is a Chinese laborer, and not entitled to land in the United States, or to be or remain therein, because he does not belong to any of the privileged classes enumerated in any of the acts of congress, known as the "Chinese Exclusion Acts," which would exempt him from the class or classes which are specially excluded from the United States by the provisions of said acts. An amended petition has been filed, in which the detained himself petitions the court for a writ to test the legality of his detention. The amended petition sets out the facts of petitioner's detention, and his right to enter this country as a citizen thereof, more in detail than does the original petition; otherwise both are substantially the same. An agreed statement of facts has been filed, which is as follows:

"(1) That the said Wong Kim Ark was born in the year 1873, at No. 751 Sacramento street, in the city and county of San Francisco, state of California, United States of America; and that his mother and father were persons of Chinese descent, and subjects of the emperor of China; and that said Wong Kim Ark was and is a laborer. (2) That at the time of his said birth his mother and father were domiciled residents of the United States, and had established and enjoyed a permanent domicile and residence therein at said city and county of San Francisco, state aforesaid. (3) That said mother and father of said Wong Kim Ark continued to reside and remain in the United States until the year 1890, when they departed for China. (4) That during all the time of their said residence in the United States, as domiciled residents therein, the said mother and father of said Wong Kim Ark were engaged in the prosecution of business, and were never engaged in any diplomatic or official capacity under the emperor of China. (5) That

ever since the birth of said Wong Kim Ark at the time and place hereinbefore stated and stipulated, he has had but one residence, to wit, a residence in said state of California, in the United States of America, and that he has never changed or lost said residence or gained or acquired another residence, and there resided, claiming to be a citizen of the United States. (6) That in the year 1890 the said Wong Kim Ark departed for China upon a temporary visit, and with the intention of returning to the United States, and did return thereto on the 26th day of July, 1890, on the steamship Gaelic, and was permitted to enter the United States by the collector of customs, upon the sole ground that he was a native-born citizen of the United States. (7) That after his said return the said Wong Kim Ark remained in the United States, claiming to be a citizen thereof, until the year 1894, when he again departed for China upon a temporary visit, and with the intention of returning to the United States, and did return thereto in the month of August, 1895, and applied to the collector of customs to be permitted to land, and that such application was denied upon the sole ground that said Wong Kim Ark was not a citizen of the United States. (8) That said Wong Kim Ark has not, either by himself or his parents acting for him, ever renounced his allegiance to the United States, and that he has never done or committed any act or thing to exclude him therefrom."

The question to be determined is whether a person born within the United States, whose father and mother were both persons of Chinese descent, and subjects of the emperor of China, but at the time of the birth were both domiciled residents of the United States, is a citizen, within the meaning of that part of the fourteenth amendment of the constitution which provides that:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside."

The district attorney was assisted by Mr. George D. Collins, of the San Francisco bar, who appeared in the matter as amicus curiæ. Mr. Collins' position upon this question has been known for some time, and his views have been expressed in able and interesting articles in the American Law Review. 18 Am. Law Rev. 831; 29 Am. Law Rev. 385. He maintains that the doctrine of international law as to citizenship exists in the United States, and not that of the common law; that the citizenship clause of the fourteenth amendment is in consonance with the international rule, and should be so interpreted; and that, therefore, birth within the United States does not confer the right of citizenship. His views have been repeated and elaborated in his brief with much reasoning and plausibility. It is contended on the part of the United States that the words "subject to the jurisdiction thereof," mean subject to the political jurisdiction of the United States; that is to say, that the petitioner, Wong Kim Ark, though born within the United States, was not born subject to the political jurisdiction of the general government, for the reason that his father and mother were and are Chinese subjects, and that, according to the rule of international law, the political status of the child follows that of the father, and that of the mother when the child is illegitimate. It is urged, therefore, that the mere fact of birth in this country does not, ipso facto, confer any right of citizenship. The position contended for assumes, practically, that the provision of the fourteenth amendment under consideration intended to follow and adopt the rule of international law. In support of

this view, the remarks of Mr. Justice Story in Shanks v. Dupont, 3 Pet. 243, 247, are cited, to the effect that:

"Political rights do not stand upon the mere doctrines of municipal law, applicable to ordinary transactions, but stand upon the more general principles of the law of nations."

It is contended, further, that the common-law doctrine does not govern the determination of the question of citizenship, for the reason that there is no common law proper of the United States; citing Wheaton v. Peters, 8 Pet. 658; Kendall v. U. S., 12 Pet. 524; Lorman v. Clarke, 2 McLean, 568, Fed. Cas. No. 8,516; U. S. v. New Bedford Bridge, 1 Woodb. & M. 401, Fed. Cas. No. 15,867; People v. Folsom, 5 Cal. 373; In re Barry, 42 Fed. 113. Finally, it is maintained that the United States supreme court, in interpreting the first clause of the fourteenth amendment, now in question, in the Slaughterhouse Cases, 16 Wall. 36, adopted, to all intents and purposes, the rule of international law when it said through Mr. Justice Miller:

"The phrase, 'subject to its jurisdiction,' was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign states born within the United States."

The interpretation, by the supreme court, in the case of Elk v. Wilkins, 112 U. S. 102, 5 Sup. Ct. 41, of this same phrase is also cited in support of the contention made in favor of the rule of international law. On the other hand, counsel for petitioner contend that what the supreme court said in the Slaughterhouse Cases, supra, is but mere dictum, and that, outside of a few scattered observations of this character, that tribunal has never directly passed upon the question presented for decision in this matter, viz. whether a person born in this country of foreign parents is a citizen. But it is claimed that that question has been adjudicated in this circuit in two cases, and that the law, as there expounded, is in favor of the citizenship of the petitioner, and, being the law of this circuit, is controlling upon this court. The first of these, and the one which is principally relied on, is In re Look Tin Sing, to be found reported in 10 Sawy. 353, 21 Fed. 905, and decided in 1884. The second is the case of Gee Fook Sing v. U. S., reported in 1 C. C. A. 211, 49 Fed. 146, and 7 U. S. App. 27. The last case is a decision of the circuit court of appeals for this circuit (Ninth), rendered in 1892, which reaches the same conclusion as did the circuit court in Re Look Tin Sing. The case of Lynch v. Clarke, 1 Sandf. Ch. 583,—a decision rendered in 1844, and before the adoption of the fourteenth amendment, by Hon. Lewis H. Sandford, assistant vice chancellor of the First circuit of the court of chancery of the state of New York,—was also pressed upon the attention of the court as authority showing that it was the common-law doctrine of citizenship, and not that of the law of nations, which had been recognized in this country previous to the adoption of the fourteenth amendment. While the two decisions rendered in this circuit would seem, upon the principle of stare decisis, to be conclusive upon the question raised here, and controlling on this court, yet, in view of the fact that it has been argued on the part of the government, and very forcibly, that the supreme court laid

down in the Slaughterhouse Cases a doctrine at variance with that announced in these decisions, and, as claimed, in consonance with that of the law of nations, it will be necessary to examine these cases with care, and at some length. The question is an important one, not alone from an abstract point of view, but because of the consequences a decision unfavorable to the petitioner would involve; for, if the contention of counsel for the government be correct, it will inevitably result that thousands of persons of both sexes who have been heretofore considered as citizens of the United States, and have always been treated as such, will be, to all intents and purposes, denationalized and remanded to a state of alienage. Included among these are thousands of voters who are exercising the right of suffrage as American citizens, and whose right as such is not, and never has been, questioned, because birth within the country seems to have been recognized generally as conclusive upon the question of citizenship. But the supreme court has never squarely determined, either prior to or subsequent to the adoption of the fourteenth amendment in 1868, the political status of children born here of foreign parents. In the case of Minor v. Happersett, 21 Wall. 168, the court expressly declined to pass upon that question. Nor was there any definition, in the constitution or in the acts of congress, of what constituted citizenship, until the adoption of the fourteenth amendment. At the common law, if the parent be under the actual obedience of the king, and the place of the child's birth be within the king's obedience as well as in the dominion, the child becomes a subject of the realm; in other words, birth within the realm was deemed conclusive. This was decided in Calvin's Case, reported by Lord Coke, 7 Coke, 1, and has always been recognized as the common-law doctrine. 1 Bl. Comm. 366; 2 Kent, Comm. 9; Lynch v. Clarke, 1 Sandf. Ch. 583; U. S. v. Rhodes, 1 Abb. U. S. 28, Fed. Cas. No. 16,151. By the law of nations, birth follows the political status of the father, and of the mother when the child is illegitimate. Bar, Int. Law, § 31; Vatt. Law Nat. §§ 212–215; Sav. Priv. Int. Law, § 351.

The fourteenth amendment to the constitution of the United States must be controlling upon the question presented for decision in this matter, irrespective of what the common-law or international doctrine is. But the interpretation thereof is undoubtedly confused and complicated by the existence of these two doctrines, in view of the ambiguous and uncertain meaning of the qualifying phrase, "subject to the jurisdiction thereof," which renders it a debatable question as to which rule the provision was intended to declare. Whatever of doubt there may be is with respect to the interpretation of that phrase. Does it mean "subject to the laws of the United States," comprehending, in this expression, the allegiance that aliens owe in a foreign country to obey its laws; or does it signify, "to be subject to the political jurisdiction of the United States," in the sense that is contended for on the part of the government? This question was ably and thoroughly considered in Re Look Tin Sing, supra, where it was held that it meant subject to the laws of the United States. Mr. Justice Field, sitting as circuit judge, delivered the opinion, which was concurred in by Judges Sawyer and Sabin. There is a

note to the opinion, stating that "Judge Hoffman did not sit on the hearing of this case, but he was on the bench when the opinion was delivered, and concurred in the views expressed." The opinion discusses and decides the precise question involved in the case at bar. There, as here, a person of Chinese descent, born in the United States, but whose parents had always been subjects of the emperor of China, claimed the right to land in the United States by virtue of his right as a citizen thereof, and, as such citizen, to be unaffected by any of the Chinese exclusion acts. The court held that, although born here of parents who were subjects of the emperor of China, he was a citizen within the meaning of the fourteenth amendment; and that, though he was without the certificate required by the Chinese exclusion acts of 1882 or of 1884, being a citizen, he could not be prevented from returning to his country. The similarity of the essential facts between that case and the one at bar is obvious from the recital contained in the opinion, which is as follows:

"The petitioner belongs to the Chinese race, but he was born in Mendocino, in the state of California, in 1870. In 1879 he went to China, and returned to the port of San Francisco during the present month (September, 1884), and now seeks to land, claiming the right to do so as a natural-born citizen of the United States. It is admitted by an agreed statement of facts that his parents are now residing in Mendocino, in California, and have resided there for the last twenty years; that they are of the Chinese race, and have always been subjects of the emperor of China; that his father sent the petitioner to China, but with the intention that he should return to this country; that the father is a merchant at Mendocino, and is not here in any diplomatic or other official capacity under the emperor of China. The petitioner is without any certificate under the act of 1882 or of 1884, and the district attorney of the United States, intervening for the government, objects to his landing, for the want of such certificate."

The learned justice then continues:

"The first section of the fourteenth amendment to the constitution declares that 'all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside.' This language would seem to be sufficiently broad to cover the case of the petitioner. He is a person born in the United States. Any doubt on the subject, if there can be any, must arise out of the words 'subject to the jurisdiction thereof.' They alone are subject to the jurisdiction of the United States who are within their dominions and under the protection of their laws, and with the consequent obligation to obey them when obedience can be rendered; and only those thus subject by their birth or naturalization are within the terms of the amendment. The jurisdiction over these latter must at the time be both actual and exclusive. The words mentioned except from citizenship children born in the United States of persons engaged in the diplomatic service of foreign governments, such as ministers and ambassadors, whose residence, by a fiction of public law, is regarded as part of their own country. This extraterritoriality of their residence secures to their children born here all the rights and privileges which would inure to them had they been born in the country of their parents. Persons born on a public vessel of a foreign country, whilst within the waters of the United States, and consequently within their territorial jurisdiction, are also excepted. They are considered as born in the country to which the vessel belongs. In the sense of public law, they are not born within the jurisdiction of the United States. The language used has also a more extended purpose. It was designed to except from citizenship persons who, though born or naturalized in the United States, have renounced their allegiance to our government, and thus dissolved their political con-

nection with the country. The United States recognized the right of every one to expatriate himself and choose another country."

\*     \*     \*     \*     \*     \*     \*     \*

"With this explanation of the meaning of the words in the fourteenth amendment, 'subject to the jurisdiction thereof,' it is evident that they do not exclude the petitioner from being a citizen. He is not within any of the classes of persons excepted from citizenship; and the jurisdiction of the United States over him at the time of his birth was exclusive of that of any other country."

After adverting to the objects of the citizenship clause of the fourteenth amendment, and to the fact that one of the purposes of its enactment was to overturn the doctrine enunciated in the Dred Scott Case, the opinion continues:

"Independently of the constitutional provision, it has always been the doctrine of this country, except as applied to Africans brought here and sold as slaves, and their descendants, that birth within the dominions and jurisdiction of the United States of itself creates citizenship. This subject was elaborately considered by Assistant Vice Chancellor Sandford in Lynch v. Clarke, found in the first volume of his reports (1 Sandf. Ch. 583). In that case one Julia Lynch, born in New York, in 1819, of alien parents, during their temporary sojourn in that city, returned with them the same year to their native country, and always resided there afterwards. It was held that she was a citizen of the United States. After an exhaustive examination of the law, the vice chancellor said that he entertained no doubt that every person born within the dominions and allegiance of the United States, whatever the situation of his parents, was a natural-born citizen; and added that this was the general understanding of the legal profession, and the universal impression of the public mind. In illustration of this general understanding, he mentions the fact that when, at an election, an inquiry is made whether the person offering to vote is a citizen or an alien, if he answers that he is a native of this country the answer is received as conclusive that he is a citizen; that no one inquires further; no one asks whether his parents were citizens or foreigners; it is enough that he was born here, whatever was the status of his parents. He shows also that legislative expositions on the subject speak but one language, and he cites to that effect not only the laws of the United States, but the statutes of a great number of the states, and establishes conclusively that there is on this subject a concurrence of legislative declaration with judicial opinion, and that both accord with the general understanding of the profession and of the public."

The opinion concludes as follows:

"As to the position of the district attorney that the restriction act prevents the re-entry of the petitioner into the United States, even if he be a citizen, only a word is necessary. \* \* \* Being a citizen, the law could not intend that he should ever look to the government of a foreign country for permission to return to the United States, and no citizen can be excluded from this country except in punishment for crime. Exclusion for any other cause is unknown to our laws, and beyond the power of congress. The petitioner must be allowed to land, and it is so ordered."

In 1892, the question was again passed upon; this time by the circuit court of appeals for this circuit (Ninth), in the case of Gee Fook Sing v. U. S., supra. Gee Fook Sing, the appellant, had sued for a writ of habeas corpus in the court below (district court for the Northern district of California), claiming that he was illegally restrained of his liberty, and imprisoned on board the steamship Belgic, at the port of San Francisco, by the master of the vessel, on the ground that he was a Chinese person prohibited by law from entering into this country. The appellant contended that he was a citizen

of this country, and was not prohibited, therefore, from entering into the United States. The lower court found, upon the evidence adduced, that Gee Fook Sing had not established to its satisfaction that he had been born here, and remanded him. This judgment was affirmed by the circuit court of appeals. The court was composed of Judges Deady, Hanford, and Hawley, and the opinion was delivered by Judge Hanford. The case was submitted upon the record, without argument. In the course of the opinion, which was quite short, the court simply stated its conclusions upon the identical question presented here for decision, as follows:

"We have considered all the questions of law and fact which we find involved, and our conclusions are that, inasmuch as the fourteenth amendment to the constitution of the United States declares that all persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside, the laws excluding emigrants who are Chinese laborers are inapplicable to a person born in this country and subject to the jurisdiction of its government, even though his parents were not citizens, nor entitled to become citizens under the laws providing for the naturalization of aliens; that any person alleging himself to be a citizen of the United States, and desiring to return to his country from a foreign land, and that he is prevented from doing so without due process of law, and who on that ground applies to any United States court for a writ of habeas corpus, is entitled to have a hearing and a judicial determination of the facts so alleged, and that no act of congress can be understood or construed as a bar to such hearing and judicial determination."

The authority of In re Look Tin Sing is not referred to by the court, nor, in fact, are any authorities cited, or a discussion of the question indulged in; but it is safe to assume that Mr. Justice Field's decision was considered and followed. In 1888, Judge Deady, sitting in the circuit court for the district of Oregon, reached the same conclusion in the case of In re Chin King, 13 Sawy. 333, 35 Fed. 354. He cites In re Look Tin Sing, supra, and Lynch v. Clarke, supra, and holds that the citizenship clause of the fourteenth amendment is but declaratory of the common-law doctrine. See, also, In re Yung Sing Hee, 36 Fed. 437. It is clear that these decisions,—the one rendered in the circuit court of appeals and the other rendered in the circuit court of this district,—determining, as they do, the identical question involved in the case at bar, are conclusive and controlling upon this court, unless the supreme court of the United States has directly and authoritatively, and not by way of dictum, announced and laid down a doctrine at variance with that expounded in the cases in this circuit. The decisions of the supreme court upon all questions necessarily involved in the cause determined must be paramount, as binding authority on this court, to that of any other tribunal in the land. The circuit court of appeals act (March 3, 1891; 26 Stat. 826) has in no wise impaired or diminished the jurisdiction of the supreme court over "any case that involves the construction or application of the constitution of the United States." As it has been argued (and very plausibly) by counsel for the United States that the supreme court has laid down a different doctrine in the so-called Slaughterhouse Cases, 16 Wall. 36, it will be necessary to examine critically the propositions involved in these cases and the language of the court as contained in the pre-

vailing opinion. The Slaughterhouse Cases were decided in 1873, and the opinion was delivered by Mr. Justice Miller. In the decision most of the provisions of the thirteenth, fourteenth, and fifteenth amendments to the constitution received clear, elaborate, and able interpretation and construction. The main question at issue was as to whether or not the legislature of the state of Louisiana could grant an exclusive right or privilege for 25 years to a corporation created by it to have and maintain slaughterhouses, landings for cattle, and yards for inclosing cattle intended for sale or slaughter, within the parishes of Orleans, Jefferson, and St. Bernard, in that state; and prohibiting all other persons from building, keeping, or having slaughterhouses, landings for cattle, and yards for cattle intended for sale or slaughter, within those limits, and requiring that all cattle and other animals intended for sale or slaughter in that district should be brought to the yards and slaughterhouses of the corporation; and authorizing the corporation to exact certain prescribed fees for the use of its wharves and for each animal landed, and certain prescribed fees for each animal slaughtered, besides the head, feet, gore, and entrails, except of swine. It was held that this grant of exclusive right or privilege, guarded by proper limitation of the prices to be charged, and imposing the duty of providing ample conveniences, with permission to all owners of stock to land, and of all butchers to slaughter, at those places, was a police regulation for the health and comfort of the people (the statute locating them where health and comfort required), within the power of the state legislatures, unaffected by the constitution of the United States previous to the adoption of the thirteenth and fourteenth articles of amendment; and further, that such power was not forbidden by the thirteenth article of amendment and by the first clause of the fourteenth article. While the question of citizenship under the fourteenth amendment arose, yet it was in subordination to the main issue, and was necessary to the decision of the court only in so far as it related to an interpretation of the second clause of the fourteenth amendment, as to whether the exclusive privileges granted by the state of Louisiana abridged any of the privileges and immunities of citizens of the United States. It was in this connection that the further question arose as to who were citizens of the United States under the fourteenth amendment, and it was held that this provision protects from the hostile legislation of the states the privileges and immunities of citizens of the United States as distinguished from those of citizens of the states. But the question which is here directly involved did not arise in that case, nor did the interpretation of the court relate to such a state of facts as exists here. Obviously, therefore, what the court then said with reference to the status of children born here of foreign parents is but obiter dictum. This will be evident by a reference to that part of the opinion which contains the language claimed to be a recognition of the international doctrine on the subject:

"The first section of the fourteenth article, to which our attention is more specially invited, opens with a definition of citizenship; not only citizenship of the United States, but citizenship of the states. No such definition

was previously found in the constitution, nor had any attempt been made to define it by act of congress. It has been the occasion of much discussion in the courts, by the executive departments, and in the public journals. It had been said by eminent judges that no man was a citizen of the United States, except as he was a citizen of one of the states composing the Union. Those, therefore, who had been born and resided always in the District of Columbia or in the territories, though within the United States, were not citizens. Whether this proposition was sound or not had never been judicially decided. But it had been held by this court, in the celebrated Dred Scott Case, only a few years before the outbreak of the Civil War, that a man of African descent, whether a slave or not, was not and could not be a citizen of a state or of the United States. This decision, while it met the condemnation of some of the ablest statesmen and constitutional lawyers of the country, had never been overruled; and, if it was to be accepted as a constitutional limitation of the right of citizenship, then all the negro race who had recently been made freemen were still not only not citizens, but were incapable of becoming so by anything short of an amendment to the constitution. To remove this difficulty primarily, and to establish a clear and comprehensive definition of citizenship which should declare what should constitute citizenship of the United States, and also citizenship of a state, the first clause of the first section was framed. * * *
The first observation we have to make on this clause is that it puts at rest both the questions which we stated to have been the subject of differences of opinion. It declares that persons may be citizens of the United States without regard to their citizenship of a particular state, and it overturns the Dred Scott decision by making all persons born within the United States and subject to its jurisdiction citizens of the United States. That its main purpose was to establish the citizenship of the negro can admit of no doubt. The phrase, 'subject to its jurisdiction,' was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign states born within the United States."

That this last sentence, which is the expression relied on by counsel for the government, is mere dictum, is plain from what has been stated as the issue involved in those cases. That being so, the observations referred to and relied upon, however persuasive they may appear to be, cannot be accepted as declaring the law in this circuit, at least as against the authority of In re Look Tin Sing, where the question was squarely met and decisively settled. But it is to be observed that the supreme court, immediately succeeding the remarks just quoted, used the following significant language:

"The next observation is more important in view of the arguments of counsel in the present case. It is that the distinction between citizenship of the United States and citizenship of a state is clearly recognized and established. Not only may a man be a citizen of the United States without being a citizen of a state, but an important element is necessary to convert the former into the latter. He must reside within the state to make him a citizen of it, but it is only necessary that he should be born or naturalized in the United States to be a citizen of the Union."

Nor does the interpretation of the phrase in question in the case of Elk v. Wilkins, 112 U. S. 94, 5 Sup. Ct. 41, dispose of the matter. There the question was whether an Indian, born within the United States, and who had severed his tribal relations, was a citizen of the United States, within the meaning of the fourteenth amendment. Mr. Justice Gray, delivering the opinion of the court, said:

"This section contemplates two sources of citizenship, and two sources only,—birth and naturalization. The persons declared to be citizens are 'all persons born or naturalized in the United States, and subject to the jurisdiction thereof.' The evident meaning of these last words is, not merely

subject in some respect or degree to the jurisdiction of the United States, but completely subject to their political jurisdiction, and owing them direct and immediate allegiance. And the words relate to the time of birth in the one case, as they do to the time of naturalization in the other. Persons not thus subject to the jurisdiction of the United States at the time of birth cannot become so afterwards, except by being naturalized, either individually, as by proceedings under the naturalization acts, or collectively, as by the force of a treaty by which foreign territory is acquired. Indians born within the territorial limits of the United States, members of, and owing immediate allegiance to, one of the Indian tribes (an alien, though dependent, power), although in a geographical sense born in the United States, are no more 'born in the United States, and subject to the jurisdiction thereof,' within the meaning of the first section of the fourteenth amendment, than the children of subjects of any foreign government born within the domain of that government, or the children born within the United States, of ambassadors or other public ministers of foreign nations."

In the case of U. S. v. Rhodes, 1 Abb. U. S. 28, 40, Fed. Cas. No. 16,151, it is held that the common-law rule as to citizenship is the law of this country. This decision was made in 1866 in the circuit court for the district of Kentucky. This was about the time when the fourteenth amendment was first proposed to the several states for their adoption, although it was not formally adopted as part of the constitution until July 28, 1868.

But it would be useless to incumber this already lengthy opinion with further argument and observations upon this interesting question. Arriving at the conclusion, as I do, after careful investigation and much consideration, that the supreme court has as yet announced no doctrine at variance with that contained in the Look Tin Sing decision and the other cases alluded to, I am constrained to follow the authority and law enunciated in this circuit. Counsel for the United States have argued with considerable force against the common-law rule and its recognition, as being illogical, and likely to lead to perplexing, and perhaps serious, international conflicts, if followed in all cases. But these observations are, obviously, addressed to the policy of the rule, and not to its interpretation. The doctrine of the law of nations, that the child follows the nationality of the parents, and that citizenship does not depend upon mere accidental place of birth, is undoubtedly more logical, reasonable, and satisfactory, but this consideration will not justify this court in declaring it to be the law against controlling judicial authority. It may be that the executive departments of the government are at liberty to follow this international rule in dealing with questions of citizenship which arise between this and other countries, but that fact does not establish the law for the courts in dealing with persons within our own territory. In this case the question to be determined is as to the political status and rights of Wong Kim Ark under the law in this country. No foreign power has intervened or appears to be concerned in the matter. From the law as announced and the facts as stipulated, I am of opinion that Wong Kim Ark is a citizen of the United States within the meaning of the citizenship clause of the fourteenth amendment. He has not forfeited his right to return to this country. His detention, therefore, is illegal. He should be discharged, and it is so ordered.