## In re RODRIGUEZ.

### (District Court, W. D. Texas. May 3, 1897.)

**1. NATURALIZATION—ELIGIBILITY OF MEXICANS.**
Native citizens of Mexico, whatever may be their status from the standpoint of the ethnologist, are eligible to American citizenship, and may be individually naturalized by complying with the provisions of the naturalization laws.

**2. SAME—QUALIFICATIONS.**
An alien who is ignorant and unable to read and write, and who cannot explain the principles of the constitution, is, nevertheless, entitled to be naturalized, where it is clearly shown that he is a thoroughly law-abiding and industrious man, of good moral character.[1]

At the May term, 1896, of this court, Ricardo Rodriguez, a citizen of Mexico, filed an application, in due form, by which he sought to become a naturalized citizen of the United States. Two affidavits, embodying the essential requisites prescribed by the naturalization laws, accompanied the application, and also a copy of the affidavit made by the applicant, and filed in the county court of Bexar county, Tex., January 25, 1893, in which he declared his intention to become a citizen of the United States.

At the hearing of the application, two attorneys of the court, Mr. A. J. Evans and Mr. T. J. McMinn, appeared for the purpose of contesting the same, and filed a paper setting forth the ground of their opposition, of which the following is a copy: "Come now the undersigned, as amici curiæ, and respectfully suggest to the court that the applicant, Ricardo Rodriguez, is ineligible to citizenship, for this, to wit: that he is not a white person, nor an African, nor of African descent, and is therefore not capable of becoming an American citizen, and of this they ask the judgment of the court." In addition to the supporting affidavits filed with the application, the testimony of the applicant and J. G. Fisk was taken in open court. From the proofs on file it appears that the applicant is a citizen of Mexico by birth, having been born in the state of Guanajuato, about thirty-seven years ago. He is a very ignorant and illiterate man, not being able to read or write either English or Spanish. He speaks the latter tongue as it is spoken by others of his class and humble condition in life. It appears from his own statement that he traces his descent from neither the Spaniards nor Africans. As to color, he may be classed with

---

[1] See, at end of case, an opinion of Hon. T. M. Paschal, judge of the Thirty-Eighth judicial district of Texas, on the application for naturalization of one Richard V. Sauer.

the copper-colored or red men. He has dark eyes, straight black hair, and high cheek bones. He knows nothing of the Aztecs or Toltecs. He is not an Indian, and his parents informed him that he was a Mexican, and he claims to be "a pure-blooded Mexican." To extract from the applicant what knowledge he possessed concerning himself, counsel propounded, among others, the following questions: "Q. Do you not believe that you belong to the original Aztec race in Mexico? A. No, sir. Q. Do you belong to the aborigines or original races of Mexico? A. No, sir. Q. Where did your race come from? Spain? A. No, sir. Q. Where did your race come from? A. I do not know where they came from. Q. Does your family claim any religion? What religion do they profess? A. Catholic religion." The supporting affidavits show upon their face that the applicant is "attached to the principles of the constitution of the United States, and well disposed to the good order and happiness of the same." The inability of the applicant, made manifest upon his examination, to explain the nature of those principles, may well be attributed to his illiteracy. The testimony of J. G. Fisk, in support of the application, is here inserted at length: "Q. I see by your affidavit that you are acquainted with this applicant. A. Yes, sir. Q. And have been acquainted with him for how long? A. I couldn't say exactly, but it has been in the neighborhood of ten years. Q. Well, do you know anything about his ancestry? A. No, sir; no more than judging by his appearance, and about what he had told me previously,—that he was of pure blood. Q. I see that you make an affidavit in which you say he is of good moral character, and attached to the principles of the constitution of the United States. A. Well, I have known the man for a good while. Q. What reasons did you have for saying that he was attached to the principles of the constitution? What induced you to say that he was attached to the principles of the constitution of the United States? Did you have any intimation that he had any knowledge of the principles of the constitution of the United States? A. Not exactly, but I know the man. I know that he is a good man, and know that if, whatever the principles of the constitution of the United States might be, that he would uphold them if he knew what they were. Q. You say that you have known him for about ten years? A. In the neighborhood of ten years. Q. Has he been a peaceable citizen? A. Yes, sir; a very good man. Q. A hard-working citizen? A. Yes, sir. Q. Any children,—a man of family? A. A wife; no children. Q. Do you know what his occupation has been? A. He has been working for the city a greater part of the time; that is, working on the ditches, cleaning the ditches and river. Q. A man of good moral character? A. Yes, sir. Q. A good, law-abiding citizen? A. Yes, sir; to a remarkable degree."

### Brief of T. M. Paschal:

As a member of the committee to whom has been referred by the court the application of Ricardo Rodriguez, a citizen of the republic of Mexico, to be granted final letters of citizenship, for an opinion touching the eligiblity of the applicant under the constitution and laws of the United States and the testimony offered in support of said application, I beg leave to submit the following preparatory observations, views, and conclusions in the premises, the same having been formed and arrived at without previous conference, consultation, or comparison with my associate brothers of the committee, deeming it more likely that conclusions thus independently reached would be more nearly correct than would those actuated, more or less, by a desire for mere unanimity, such as preconcert usually inspires:

I believe I speak within a record for official action and public and official utterance when I suggest to this court that I realize the peril that confronts the free republican institutions of our country by a loose, indiscriminate—indeed, a criminally negligent—administration of our extraordinarily liberal and lenient naturalization laws. To say that the peril becomes more grave with each succeeding year is to affirm that which must be apparent to every thoughtful, intelligent, and patriotic citizen, natural or naturalized. In fact, under a system of government where the people make, interpret, and execute the laws, their reasonable intelligence, education, and virtue are indispensable prerequisites to the preservation and transmission of civil liberty and republican institutions. Patriotism, in its highest and truest sense, in a republic, cannot exist

unless resting securely upon this trio of cardinal qualities. It is true that a low form, or germ, of patriotism, that leads primitive man to defend his home, however humble or rude, may exist, and, under a monarchy more or less absolute, would suffice, without the qualities referred to, in so high a degree, at least; but where wise and just laws are to be framed to-day, to meet the complex existing conditions of a mighty republic, and to-morrow must needs be modified or repealed, to meet still more complex industrial, economic, or political changes, and yet avoid a conflict with organic state or federal law, it will readily be conceded that no graver responsibility rests upon jurist, legislator, or citizen of that republic than to see to it, within their several spheres, that the greatest practicable amount of intelligence, education, and morality is diffused among those who are charged with the tremendous responsibility of handing down to posterity, untarnished, our free institutions and best traditions, and, to this end, equally their duty to guard the "outer and inner door" of the sanctuary of American citizenship, lest those unworthy to wear it should enter.

When our form of government is considered in connection with the duties and functions of citizenship therein, we will find a polar star by which we may be guided in our interpretation of every clause of our naturalization laws, where judicial interpretation, legislative enactment, or diplomatic recognition has left the same in doubt, if not in fact obnoxious to criticism. It is the right of each nation to establish the forms and requisites for the naturalization of aliens, and to determine what acts must be done in order to acquire the new nationality. To fix the conditions in accordance with which an individual may be admitted to form part of a society cannot be the attribute of any power except the rules of such society, and it is, for the same reason, the natural and peculiar privilege of each nation to point out who may be naturalized, and by what means. Martin's Case, before Mixed Commission on Mexican & American Claims Treaty of July 10, 1868.

Citizenship may be acquired in one of the following ways, and no other: (1) By birth; (2) by compliance with our naturalization laws; (3) by constitutional amendment; (4) by collective naturalization, as where a country or province becomes incorporated in another country by conquest, cession, or free gift, and the treaty which ratifies such annexation usually provides for allowing the residents within the annexed territory a certain time within which to decide and take steps to preserve the nationality of his origin, and thus to defeat naturalization by annexation. J. C. Bancroft Davis, 1 Phillimane Internat. Law, p. 382; Pasch. Ann. Const. p. 222; 13 Ops. Attys. Gen. 397, Akerman. Illustrations of naturalization collectively or by treaty are found in the cases of those who were born in the colonies, or who resided here prior to 1776, and who adhered to the cause of independence. Again, in 1819 (October 24th) the inhabitants of Florida who adhered to the United States, and remained in the country, were by treaty of that date made citizens. All persons who were citizens of Texas at the date of annexation, December 29, 1848, became citizens of the United States by virtue of collective naturalization effected by the act of that date. See [1871] 13 Ops. Attys. Gen. 397, Akerman. So, likewise, were the citizens of California and other territory acquired by the treaty of Guadalupe-Hidalgo on the 2d of February, 1848, and who remained and adhered to the United States (McKinney v. Saviego, 18 How. 239); and again, in 1854, all the Mexican citizens, inhabitants of Arizona, who adhered to and remained in the United States (10 Stat. 1035, art. 5); and, finally, all the free white or European inhabitants of Louisiana, and the creoles, of native birth, residing there at the time of the purchase from Napoleon First, and who remained in and adhered to the United States, and the descendants of all such were, by the treaty of April 30, A. D. 1803, made citizens (8 Stat. 202, art. 3). Nationality obtained in this manner, said the arbitrator, must be as sound and valid as that procured by individual specific compliance with the naturalization laws. In re Galetes Marnot v. Spain, United States and Spanish Commission under Agreement of February 12, 1871.

While it seems to be true that no treaty exists (that of 1868 having been rescinded, under notice from Mexico) by virtue of which the applicant may claim the right or privilege to become naturalized, yet these illustrations and authorities, together with others equally cogent, are of great importance as

to the main question which is at issue in this case, viz. as to the eligibility of the applicant for naturalization, because of the ethnological feature involved in the case, or, in other words, because he is not a "white" man, and apparently belongs to the Indian or red race (nations of North and South America), and as going to show what interpretation or construction was placed upon our naturalization laws by the treaty-making power of the government, confessedly, as to a large class of inhabitants incorporated in our country by annexation, treaty, or purchase, and who were not, in the strict and narrow meaning of the term, of the white, or Caucasian, race.

The cases of In re Ah Yup, 5 Sawy. 155, 1 Fed. Cas. 223, and In re Camille, 6 Fed. 256, have been cited, and are strongly relied on in support of the proposition that the white, or Caucasian, and negro, or African, race, alone are eligible to citizenship under the statute of February 18, 1875. In the former (which is much the ablest and best-considered case of the two) this principle is not asserted by implication, much less distinctly enumerated, but the decision is clear and emphatic that the Chinese or Mongolian was intended expressly to be excluded by congress when the whole question was under discussion, in 1869–70, on Senator Sumner's amendment to strike out the word "white" from the naturalization law, that had been omitted after the adoption of the thirteenth and fourteenth amendments, and subsequently inserted under the revision of the statutes by section 2169 of the act last above referred to. The debates attending the passage of an act are, by well-settled canons of construction, an infallible guide to determine the legislative intent; and these leave no shadow of doubt touching the race that was intended to be denied the boon of American citizenship, and what was the motive that prompted the American congress to deny that privilege to that race,—unquestionably the same that actuated the congress to insert the word "white" in the first instance, viz. the fear of interference with the unrestricted operation of slavery, by giving the large number of Africans that were then being imported an opportunity to become American citizens. So it refused to strike out the word "white," even to allow the negro the benefit of citizenship,—the most natural mode,—but decided, by separate provision, that the naturalization laws should apply to Africans and persons of African descent. The fear of Mongolian citizenship arose from considerations of the highest national policy. That race was not only alien in color, but was, in all things that render possible a sound citizenship, the very antipodes of the Anglo-Saxon or even native American races. His total inability to assimilate with our people in their laws, customs, institutions, or religion, or even to suffer his acquisitions to go into the general store of national prosperity; his idol worship; his mode of living; his very vices; and, lastly, the countless myriads who stood hovering on the shores of the Chinese waters, ready and anxious to swarm upon us, like the Goths and Huns upon ancient Rome,—were a menace that it would have been unpatriotic and unwise in the extreme to have disregarded; and yet, when the word "white" was first inserted, no such danger confronted us, nor was anticipated, and it was solely intended to meet the then solely existing danger or evil of African citizenship, possibly of the numerous tribes of Indians in their wild or tribal state. The term "Caucasian," while used and commonly understood to embrace only the white races, is now abandoned by all acknowledged writers on ethnology as too restricted a term to embrace all those races who first peopled and flourished on the shores of the Mediterranean, and erroneously supposed to be a pure Caucasian stock. The term now applied is "Mediterraneans." These are now scattered over the whole world, and, as a species, have no equal, physically or mentally. The skin is, as a rule, of a light color, but appears in all tinges from pure white or a ruddy white, through yellow and yellow brown, to dark and even black brown. Their species are divided into four races, connected only by the roots. Two of these races, the Basques and Caucasians, are represented by only very small remnants. The Basques formerly inhabited the whole of Spain and south of France, but now dwell near the northern coast of Spain, at the foot of the Bay of Biscay. The Aztec, Indian, or copper-colored races have been for over 350 years amalgamating, assimilating, and incorporated with the Spanish and Basque stock who subjugated these original peoples. Their tribal or wild state has been for centuries abandoned. Under most adverse conditions, they have displayed an ability

to advance modern Christian civilization along the lines of its best traditions.— truly remarkable when those conditions are considered. The first really great step forward and blow struck for liberty and free government in Mexico was by Hidalgo and Inanez, both of pure Indian or Aztec stock; and to-day one of the most enlightened, progressive, and ablest rulers of this or any other age occupies the presidential chair, in whose veins runs more of the Aztec or Indian strain than of the Spanish or Caucasian. These instances, however, can be multiplied beyond number. What is true of the ability and aptitude of the Aztec or native races of Mexico to assimilate the ideas in government, morals, progress, political economy, social and domestic regulations, and, above all, our religious codes, is equally true of many of the races of North American Indians. If the American people, as a whole, have faith, as they do, that in time the African or negro will prove to be a stock on which can be grafted an excellent, if not the best, type of American citizenship, surely the evidences are not wanting that equal or greater possibilities exist in a race who, in religion, war, statesmanship, letters, science, music, art, painting, have shown so many and such conspicuous examples. Add to this the fact that no legal barriers exist to the union or mingling of the whites of either country and native Mexican races, and the further fact that, among the comparatively few who might seek citizenship, not a sufficient number apply to make any appreciable effect upon our institutions as a nation, and it will be conceded that no analogy exists, in the very fundamental nature of things, between the exclusion of the Mongolian and the proposition to exclude a citizen of Mexico, not living in a wild or tribal state, and who for many years has resided among us, subject and obedient to our laws. In my judgment, the highest test, looking to the preservation and transmission of civil liberty and free republican institutions, that can and that ought to be applied to races,—other than the Mongolian, whose ineligibility is settled,—of their eligibility to American citizenship, is stated in the pregnant language of the statute itself, viz. that "he is a man of good moral character, and that he is attached to the principles of the constitution of the United States, and that he is well disposed to the good order and happiness of the same." "* * * In these words are written the whole law and the prophets." This involves a reasonable and fair knowledge of the general outlines of our form of government and republican institutions; i. e. the right of trial by jury, elective franchise, subordination of the military to the civil authority, immunity from search, seizure, attainder, or confiscation, save as authorized by law. It involves intelligence to that extent, for how, otherwise, could the applicant swear to an attachment to what he is ignorant of, or be well disposed to the good order and happiness of a country, the rudiments of whose institutions he was densely ignorant of? It is admitted that the Case of Camille, before referred to, is in point adversely to the eligibility of an Indian; but it is respectfully submitted that the case bears not the slightest evidence of having been well considered, and abounds in inaccuracies as well. For instance, it avers that the court, in Ah Yup's Case, before alluded to, declared that "the words 'white person,' as used in the naturalization laws, mean a person of the Caucasian race," etc. That case (Ah Yup) simply decides that a Mongolian is ineligible, and concludes as follows: "It was intended to exclude some classes, and, as all white aliens and those of the African race are entitled to naturalization under other words, it is difficult to perceive whom it could exclude, unless it be the Chinese." Again, the learned judge wholly and erroneously ignores the accurate and restricted sense in which the term "Caucasian" is used by ethnologists, when he says: "One using the term 'white person' would intend a person of the Caucasian race." The most serious criticism, however, to which that decision is obnoxious, and that which to my mind discloses the fact that the learned judge fully realized that the construction which he gave, and fancied had been given also by Judge Sawyer, in Re Ah Yup, had led to an illogical and most inconsistent conclusion, is shown by the following language: "From the first, our naturalization laws only applied to the people who had settled the country,—the Europeans or white race,—and so remained until 1870, when, under the pro-negro feeling, generated and inflamed by the war with the Southern states, and its political consequences, congress was driven at once to the other extreme, and opened the

door, not only to persons of African descent, but to all those of 'African nativity,' thereby offering the boon of American citizenship to the comparatively savage and strange inhabitants of the 'Dark Continent,' while withholding it from the intermediate and much better qualified red and yellow races." The court then assumes that this "inconsistency" was due to congress indulging in "buncombe," and being under no apprehension that the natives of Africa would avail themselves of the "boon"; but it is respectfully submitted that these are violent assumptions to excuse or assume so grave inconsistency.

In Elk v. Wilkins, 112 U. S. 94, 5 Sup. Ct. 41, a very elaborate, learned, and able presentation of some of the questions we have been considering is made by the supreme court of the United States, Justice Gray delivering the opinion. In that case, Elk sued Wilkins, registrar, for refusing to register him as a voter in Omaha. He alleged that he had "severed his tribal relations with the Indian tribe to which he belonged," and "had fully and completely surrendered himself to the jurisdiction of the United States," and declared that, by virtue of the fourteenth amendment (he having been born in the United States), he was a citizen of the United States, and entitled to the rights and privileges of a citizen. A demurrer to the petition was sustained. Plaintiff electing to stand by his pleadings, a writ of error was sued out. I do not deem it necessary, for the purposes of this discussion, to follow that opinion throughout its lengthy reasoning, because it is wholly unnecessary to a clear perception of the proposition upon which this case turns, but I will only quote such portions as will substantiate and enforce those propositions, and the inevitable deductions therefrom, which are: (1) That the word "white" was inserted in our naturalization laws in the beginning wholly to exclude the negro from citizenship. (2) It was subsequently omitted when danger from this source no longer existed. (3) It was inserted again when the laws were revised, when the new danger from hordes of Mongolians on our Pacific border confronted us; and (4) when political conditions seemed, in the opinion of the party in power, to demand it, the amendment to strike it out was defeated expressly to exclude that race, and the African was specially excepted from its operations, from which we deduce the following: That the question of eligibility of an Indian depends not on his color, but (1) whether there are treaty stipulations that make him a citizen, or by compliance with some of its provisions he may become one; or (2) whether he has abandoned his tribal relations, and become subject to the jurisdiction of the United States, and been recognized and accepted by the state or United States as such, and makes application under our law to be naturalized.

We think we might safely rest the case with the ethnological question before referred to, as to the strictly proper classification of the descendant of an aboriginal inhabitant of Mexico, whose ancestors had been, politically and religiously, incorporated for over 300 years with one of the proudest, finest, and purest scions of the true Caucasian race,—the Spaniards and their fellow countrymen, the Basques,—during which time even their very language has been lost, and their blood so freely intermingled with the pure stock of either that the fair, blue-eyed Castilian, or tawny, low-browed, straight coarse haired Aztec, is seldom met with. One might as well affirm, almost, that prior to the restoration of Alsace and Lorraine to the Fatherland, from which they had been forcibly torn 300 years before, those provinces were aught else but French in any essential particular. As well say the Normans left no indelible impress or modification upon the laws, customs, religion, and institutions of the Saxons. All history points with unerring fingers to the inevitable fading away of every lesser and ruder form of civilization when brought in contact with that great dominant Latin race, whether Cæsar, Charlemagne, Columbus, Cortez, Pizarro, or Napoleon marched at the head of their conquering legions, as it points with equal unerring certainty to the fact that the Anglo-Saxon has carried his language, his laws, his customs, his progress, and his institutions to every quarter of the globe where floats his flag. I repeat, I think it might be safely left to the broad principles involved in these considerations, rather than to a hairsplitting, technical, and meaningless consideration of who are meant by "white people," save such as we know are excluded by express judicial interpretation and legislative intent, and those expressly declared to be excepted from that

interpretation. The spirit of the law must be present, whatever may be its letter, else we may have no flavor in its meat, or saving grace in it.

But, recurring to the decision last alluded to, the court says (page 100, 112 U. S., and page 45, 5 Sup. Ct.): "Chief Justice Taney, in the passage cited for the plaintiff from his opinion in Scott v. Sandford, 19 How. 393-404, did not affirm or imply that either the Indian tribes or individual members of those tribes had the right, beyond other foreigners, to become citizens of their own will, without being naturalized by the United States. His words were: 'They (the Indian tribes) may, without doubt, like the subjects of any foreign government, be naturalized by the authority of congress, and become citizens of the state and of the United States; and if an individual should leave his nation or tribe, and take up his abode among the white population, he would be entitled to all the rights and privileges which would belong to an immigrant from any other foreign people.' " Again, on same page, the court says: "The alien and dependent condition of the members of the Indian tribes could not be put off at their own will, without the action or assent of the United States," and it is this reason—i. e. failure to recognize in some manner, by the state or United States, this act of subjection to its authority or jurisdiction—that was the basis of the court's action in sustaining the demurrer to the plaintiff's petition. They were never deemed citizens of the United States except under explicit provision of treaty or statute to that effect, either declaring a certain tribe, or such members of it as chose to remain behind on the removal of the tribe westward, to be citizens, or authorizing individuals of particular tribes to become citizens on applications to a court of the United States for naturalization and satisfactory proof of fitness for civilized life. See, for examples of which, treaties, in 1817 and 1835, with Cherokees, and, in 1820, 1825, 1830, with Choctaws; Wilson v. Wall, 6 Wall. 83; Ops. Attys. Gen., Taney; Karrahoo v. Adams, 1 Dill. 344, 346. Fed. Cas. No. 7,614; Acts Cong. March 3, 1839, c. 83, § 7, concerning Brothertown Indians; and other authorities there cited. The court further says that, though plaintiff alleges that he had fully and completely surrendered himself to the jurisdiction of the United States, he does not allege that the United States accepted his surrender, or that he has ever been naturalized or taxed, or in any manner recognized or treated as a citizen by the state or by the United States. I apprehend that the converse of this proposition would be that, had this allegation been made by Elk, his right to citizenship would not have been questioned by the court, regardless of his color.

Is there, then, anything in the law, or in this decision, or in the underlying reasons therefor, which raises a presumption or inference that while an Indian born here may be naturalized or otherwise become a citizen, despite his color, yet, if he be born in Mexico, South America, or Canada, he is ineligible on that account? I confess I see no shadow of reason for any such assumption, either in the law in its underlying principles, or in the conditions that confront the country to-day. Every danger, real or imaginary (and I concede that there is a serious danger to our institutions from the loose and indiscriminate administration of our naturalization laws), can be amply remedied by a sensible, logical, and yet plain, interpretation of their several provisions, and a rigid enforcement of them, without such an illogical one as is sought in this instance. That interpretation has been outlined in the first stages of this opinion. There is no shadow of a doubt that the safety and welfare of our government, its people and institutions, depend largely on those charged with granting citizenship, whether by treaty, constitutional amendment, legislative enactment, or through the medium of the courts, to see to it that all who seek admission to our political family should have a fair knowledge or understanding of our form of government, its basic structure and underlying principles, as hereinbefore specified, of his general rights, duties, and privileges as a citizen. If it be contended that to acquire even that rudimentary knowledge would involve several years of study, reading, or observation, and perhaps more or less knowledge of the English language, I reply: (1) The American youth, though generally of rare intelligence and clear perceptions and knowledge upon this and kindred subjects, is denied the right to vote, hold office, or sit on a jury, before he is 21 years old; (2) that a man born here has the advantage of inherited love of the country, its traditions and institutions, all of which must take time to acquire by one raised to manhood under another

flag, other laws, customs, and ties of a numberless character. Can he complain justly, then, that before we exact his allegiance in war, and trust to his wisdom in peace, to assist us in framing laws that have taken centuries to crystallize, and to preserve and transmit our sacred traditions and free institutions to posterity,—in short, to help govern this great people,—he shall, at least, have a fair knowledge of these principles which he is swearing to support, and that he is attached to? Shall we suffer him to take a meaningless oath? Is it unfair to insist that he shall stand in this respect approximately where the great mass of native-born American youths stand before they—our sons and brothers—are suffered to participate in governmental affairs? Tens of thousands of citizens of Texas are excluded from jury service under our educational qualifications. The civil service rules exclude hundreds of thousands of bright, brainy, deserving American youths and maidens from lucrative and needful employment, all of which require a fair knowledge of geography, history, mathematics, our form of government and its general principles, and yet good citizens rejoice at the placing of our governmental affairs on a higher plane than heretofore. So self-evident do these propositions appear to my mind that I am tempted to declare that no patriotic American citizen of barely average intelligence, whether native born or naturalized, will raise a voice in opposition thereto. Whence, then, comes the protest when the voice of sturdy American patriotism is lifted in warning to his fellow countrymen to check the evils alluded to? From the political trickster and demagogue alone.

If the reasoning herein is sound, the conclusion is inevitable that the applicant, Rodriguez, admitting that he is clearly shown by the testimony to be of Indian origin or extraction, of whole or part blood, but conceding that he has severed his tribal relations, and is a citizen of Mexico, is eligible; but, so far as the evidence discloses, it does not appear to my mind that he has even a fairly approximate knowledge of the form or general structure of our government, of any of the rights, duties, or privileges of a citizen thereof, and hence it is impossible for him to swear either intelligently or conscientiously that he is "attached to the principles of the constitution" of the United States, or "well disposed to its good order and happiness." This, however, is a fact upon which the court must be "satisfied," in the language of the statute; and the degree of intelligence that is requisite is a question that must appeal to the individual judgment of the judge.

I beg to express my regret that, owing to absence due in part to sickness in my family, to a futile effort to obtain originals of debates, treatises, reports, and documents that bear on the question involved, much of the time allotted by the court has slipped away; and I have at last been unable to systematize and present in a logical manner such observations and conclusions as I have reached, not even to make a redraft of them, to eliminate repetitions, or render more perspicuous that which I fear has been often somewhat crudely expressed; but my object has rather been to attack the apparent and too literal interpretation of the law,—its raison d'être,—and merely to quote authorities in so far as they clearly bore on this phase of the question, and to invoke the court's serious and thoughtful consideration of that which it seems to me beyond cavil to be the great pivotal point upon which the admission to American citizenship should depend, feeling confident that the trained legal mind of the court will as quickly grasp any suggestions worthy of its attention, though deficient in grace, elegance, or force of expression, and even segregated from their logical or proper sequence, as though all had been pearls of thought strung in their proper proportion. All of which is respectfully submitted.

### Brief of Floyd McGown:

The facts succinctly are: (1) Ricardo Rodriguez filed, in accordance with the law, his declaration of intention to become a citizen of the United States of America, on the 25th day of January, A. D. 1893, with Thad W. Smith, county clerk Bexar county, Tex. In this declaration it is shown that he was then 35 years of age, a natural-born subject of Mexico, born in Villa de Hijules, and arrived in Port Laredo February 15, 1883. (2) His application for final papers was filed in the United States circuit court, in and for the Western district of Texas, at San Antonio, on May 11, 1896, and was in due form. Accompanying this application are the affidavits of L. G. Peck and

Lorenzo Galvan, to the effect that the applicant has resided in the United States for more than five years, and has behaved as a man of good moral character, is attached to the principles of the constitution of the United States, and is well disposed to the good order and happiness of the same. (3) At the hearing of this application it was proved that the applicant was born in Ojueles, Mex., and had been there and in Lampasos, Mex., prior to coming to San Antonio, Tex., some 13 years ago. His father's name was —— Rodriguez, and his mother's name was Petra Hernandez. They were both born and lived near Ojueles, in the state of Guanajuato, Mex. They were of Mexican parentage, and he never heard of them speaking any other language, or of having come from any other country. His parents told him he was a Mexican. The applicant stated that he wished to become a citizen of the United States, because he lived here. He knew nothing about the constitution or laws of the United States, nor did he know how it was governed, nor could he read or write in any language. He knew the name of the president of Mexico, having seen his picture. He did not know the name of the president of the United States. He believed that Texas was a state, but did not know the name of the governor. He stated he was a pure-blooded Mexican, having neither Spanish nor African blood in him. The applicant has dark eyes, straight, black hair, chocolate brown skin, and high cheek bones.

The conditions to naturalization are: (1) The constitution (article 1, § 8, cl. 4) gives to congress the power "to establish an uniform rule of naturalization"; and section 2165, Rev. St. U. S., declares: "An alien, being a free white person, may be admitted to become a citizen of the United States in the following manner, and not otherwise": (1) By declaration of his intention, etc. (2) By declaring his support of the constitution, etc. (3) By proving five years' residence, etc., moral character, attachment to the principles of the constitution of the United States, and well disposed to the good order and happiness of the same. Section 2169, Id., declares: "The provisions of this title shall apply to aliens (being free white persons, and to aliens) of African nativity, and to persons of African descent." 18 Stat. 318 (Act Feb. 18, 1875).

## Application of the Requirements to the Facts in This Case.

The applicant has complied with all the requirements, and is entitled to citizenship, unless defeated: (1) Because he is not a free white person; (2) because of his ignorance of the principles of the constitution of the United States of America. In re Kanaka Nian (Utah) 21 Pac. 994. The amendment of 1875, limiting the right of naturalization to free white persons (and Africans, not involved in this case), restored the restrictions found in the old statutes. These words must be held to have their natural and ordinary meaning, and, fortunately, we are not left in doubt as to their significance, for this statute has come under repeated judicial scrutiny, and these words are definitely construed. On April 29, 1878, in the case of In re Ah Yup, 1 Fed. Cas. 223. Mr. Justice Sawyer said: "As ordinarily used in the United States, one would scarcely fail to understand that the party employing the words 'white person' would intend a person of the Caucasian race." On November 2, 1880, in the case of In re Camille, Mr. Justice Deady, 6 Fed. 256, after quoting from the opinion in the Ah Yup Case, used this language: "In all classification of mankind hitherto color has been a controlling circumstance, and for this reason Indians have never, ethnologically, been considered white persons, nor included in any such designation. From the first our naturalization laws only applied to the people who had settled the country, the European or white race." And these cases were approved by Mr. Chief Justice Zane, of the supreme court of Utah, on June 7, 1889, in the Case of Kanaka Nian, a native of Hawaii, reported 21 Pac. 993. Mr. Justice Colt, on June 24, 1894, in the case of In re Saito, a Japanese, reported in 62 Fed. 126, said: "These words were incorporated in the naturalization laws as early as 1802. At that time the country was inhabited by three races: The Caucasian, or white, race; the negro, or black, race; and the American, or red, race. It is reasonable, therefore, to infer that when congress, in designating the class of persons who could be naturalized, inserted the qualifying word 'white,' it intended to exclude from the privilege of citizenship all alien races except the Caucasian." In the Deportation Cases, 149 U. S. 698, 13 Sup. Ct. 1016, the Ah Yup and

several of the above cases are cited with approval by the United States supreme court. See, also, U. S. v. Perryman, 100 U. S. 235; Lynch v. Clarke, 1 Sandf. Ch. 583; Chirac v. Chirac, 2 Wheat. 259; Elk v. Wilkins, 112 U. S. 94, 5 Sup. Ct. 41; Nevada v. Ah Chew, 16 Nev. 50; 9 and 13 Ops. Attys. Gen.; 5 Myer, Fed. Dec. "Citizenship," 829 (1 Fed. Cas. 223); U. S. v. Rhodes, 1 Abb. (U. S.) 28, 27 Fed. Cas. 785. These latter authorities we have not examined. U. S. v. Ritchie, 17 How. 525, is an interesting case, showing who are citizens of Mexico. Its population is composed of several races.

Under these authorities, the applicant is not entitled to naturalization, unless he is of a Caucasian, or white, race. His appearance indicates that he is a descendant of the original races of Mexico. To determine to what races these people belong, we have examined the following authorities: According to E. B. Tylor, author of the article on "Anthropology," in 2 Enc. Brit. p. 111, the popular terms describing white, yellow, brown, and black races, which often occur in ancient writings, are still used. But, for scientific purposes, greater accuracy is required. This is obtained by Dr. Brocas' table, by which "the varieties of the human skin may be followed from the fairest hue of the Swede, and the darker tint of the Provençal, to the withered leaf brown of the Hottentot, the chocolate brown of the Mexican, and the brown black of the West African." In discussing Blumenbach's division (Caucasian and Malay), he says: "The ill-chosen name of 'Caucasian,' used by B—— to denote what may be called 'white men,' is still current. It brings into one race peoples such as the Arabs and Swedes, although these are scarcely less different than the Americans and Malays." By "Americans" here is meant the aborigines of this continent, who clearly, in his opinion, constitute a distinctive race from the Caucasians, or whites.

It seems, then, that, by the scientific classification, the applicant is not a white person. He certainly is not in the sense in which these words are commonly used and understood in the every-day life of our people. Hence, under the rule placing the burden upon the applicant to show his eligibility to citizenship, we are of the opinion that his application ought to be refused. And, incidentally, we are of the opinion that, if he were a white person, his utter ignorance of the principles of our constitution would defeat his application.

## Brief of A. J. Evans:

Admitted and proven facts: Applicant is a native-born person of Mexico, 38 years old, and of pure Aztec or Indian race, one of the races found in Mexico when conquered by Cortez, in 1519; came to the United States before 1883, and in that year made his first declaration of intention, and now offers his final declaration, in due form of law, and supports his declaration by two witnesses.

As a friend of the court, I challenge the right of the applicant to become a citizen of the United States, on the ground that he is not a man or person entitled to be naturalized under the laws of the United States. Laws Cong. "To establish an uniform rule of naturalization." Const. U. S. art. 1, § 8, cl. 4. "That any alien (being a free white person) may be admitted to become a citizen of the United States, or any of them, on the following conditions, and not otherwise." Act April 14, 1802. The act of July 17, 1862, extended naturalization to soldiers in the army and navy, but did not otherwise change the law. "The provisions of this title ["Naturalization"] shall apply to aliens (being free white persons), and to aliens of African nativity, and to persons of African descent." Act 1870. The above are the acts of congress in force on the subject; and if the applicant is an alien, and a free white person, or of African nativity or descent, then he is entitled to naturalization. It is confessed that he is an alien, but it is denied that he is a "white person," in the eyes of the acts of congress, or an African, or of African descent. The applicant is a native Mexican. Mr. Dana, in his American Encyclopedia, published in 1876 and 1881, says: "The population of Mexico comprises about six million Indians of unmixed blood, nearly one-half of whom are nomadic savage tribes of the mountain districts of the north; about five million whites or creoles, chiefly descended from the early Spanish colonists; perhaps twenty-five thousand Africans or hybrids, possessing some negro blood, whether mixed with the European or the Indian

element: and the Mestizos, or half-breeds, derived from the union of the whites and Indians." "Of the Indians, there are thirty-five tribes," etc.

Now, it is clear from the evidence of Mr. Fisk in this case, and from the appearance of the applicant, that he is one of the 6,000,000 Indians of unmixed blood, named above, and most probably a member of one of the 35 tribes above. If so, is he a "white person"? If an Indian, he cannot be naturalized. Elk v. Wilkins, 112 U. S. 94, 5 Sup. Ct. 41; Rev. St. U. S. § 2169. "This section does not include Indians." See 7 Ops. Attys. Gen. p. 746; In re Camille, 6 Sawy. 541, 6 Fed. 256; 2 Kent, Comm. p. 72; Lynch v. Clarke, 1 Sandf. Ch. 583; 9 Ops. Attys. Gen. 373. Something has been said about naturalization or extending the right of naturalization by treaty. I opine no treaty can be found with Mexico that makes her citizens citizens of the United States, or that extends to her citizens the rights of naturalization when they come to the United States, for the simple and cogent reason that the power of naturalization is in congress, and not in the treaty-making power; i. e. the president and the senate. Judge Deady, in a single sentence in the case above cited (In re Camille), settles that question when he says: "The power to say when and under what circumstances aliens may become citizens belongs to congress." The last act of congress on the subject, that of adding the African and his descendants "to free white persons," was passed in 1870, and I know of no treaty with Mexico since that date affecting our naturalization laws. If such a treaty did exist before that date, it is wiped out by the act of 1870, which covers the whole ground. The most probable account of the origin of the aborigines of Mexico is that they are of Asiatic or Mongolian descent, and "crossed from Asia to America by a chain of islands, which in the remote ages stretched at the north from the shores of the eastern to those of the western continent." 11 Dana, Am. Enc. art. "Mexico." The questions here raised have no political significance whatever, for the reason that the state of Texas, in her sovereign capacity, determines who shall or shall not vote, and Texas, if she chooses, can make the wildest Indian of Mexico a voter upon one hour's arrival.

## Brief of T. J. McMinn:

Mexicans eligible: (1) Zavala and other patriots; (2) sons, descendants of patriots; (3) Mexicans, residents on Independence Day; (4) descendants of such residents; (5) Spanish, Caucasian Mexican citizens. Mexicans ineligible: Excepting above, all Mexicans. Because, first, the Texas revolution was fought to get rid of the "Mexican people," who, in the declaration of independence, were declared to be "unfit to be free, and incapable of self-government." See Declaration of Independence. Because, second, at the first convention, in 1835, it was held that "all free whites and Mexicans opposed to central government" should vote. See Brown's Hist. Tex. 445. Because, third, Sam Houston wrote to Gov. Smith, January 17, 1836: "I have no confidence in them." Because, fourth, the Mexican, a genuine Mexican, is an Indian, a Mexican Indian; and Indians are ineligible. Nevada v. Ah Chew, 16 Nev. 50, 61; 1 Internat. Dig. pp. 344–563; 9 Ops. Attys. Gen. p. 356, Black; Rev. St. U. S. § 2169; In re Ah Yup, Myer, Fed. Dec. "Citizenship," p. 829, 1 Fed. Cas. 223; In re Camille, 5 Myer, Fed. Dec. 827, 6 Fed. 256; In re Kanaka Nian (Utah) 21 Pac. 993. Because, fifth, it was not ever politically contemplated by the United States that Mexicans should become citizens. Opponents of the Mexican war in congress charged the Democrats with the intention of introducing to citizenship a foreign, alien, and antagonistic class of people, incapable of self-government. Senator McDuffie denied that charge. Globe, vol. 14, p. 335. And H. S. Foote, answering Dayton, said: "No sane man of practical intellect would think of intrusting them [Mexicans and Indians] with American citizenship." Globe, vol. 19, p. 127. John C. Calhoun said, January 4, 1848: They "were incompetent to become Republicans." "They cannot govern themselves. Shall they govern us?" Sam Houston (1850), in the senate, said: "A proposition to extend suffrage to Mexicans would involve the greatest responsibilities." Because, sixth, the treaty of Guadalupe-Hidalgo excludes the Mexicans, and was so understood by Mexican diplomatists. See Extr. Sess. Senate, pp. 19-27. The proposition and desire of Mexico, not accepted by United States, is found on page 48. Letter sent to Buchanan (page 171) expresses fear of those people becoming citizens. See Mex. Project, pp. 341-343.

MAXEY, District Judge, after stating the case, delivered the following opinion:

Recognizing the delicacy and gravity of the question which the present application involves, it was thought advisable to obtain the views of several members of the bar as to the proper construction of that clause of the naturalization statute which the court is called upon to consider and construe. · With that object in view, the court addressed letters to Mr. T. M. Paschal and Mr. Floyd McGown, inclosing therewith copies of the papers and testimony on file. Generously responding to the wish of the court, these gentlemen have submitted able and interesting briefs, which have received, together with those of Mr. Evans and Mr. McMinn, the attentive consideration which the nature of the case and importance of the question demand. And the court now desires to express its acknowledgments to all counsel appearing in the case for the valuable aid thus rendered.

The applicant, a citizen by birth of the republic of Mexico, desires to avail himself of the inherent right of expatriation, and to invest himself with the rights and privileges pertaining to citizenship of our country. Although 49 years have elapsed since the· negotiation of the treaty of Guadalupe-Hidalgo, which greatly increased our territorial area, and incorporated many thousands of Mexicans into our common citizenship, as will be hereinafter shown, the question of the individual naturalization of a Mexican citizen is now for the first time, so far as the court is advised, submitted for judicial determination. To the question, why may not he be naturalized under the laws of congress? it is replied that by section 2169 of the Revised Statutes it is provided: "The provisions of this title shall apply to aliens (being free white persons, and to aliens) of African nativity, and to persons of African descent." The contention is that, by the letter of the statute, a Mexican citizen, answering to the description of the applicant, is, because of his color, denied the right to become a citizen of the United States by naturalization; and, in support of this view, the following authorities are relied upon: In re Ah Yup (decided by Judge Sawyer in 1878) 5 Sawy. 155, 1 Fed. Cas. 223; In re Camille (decided by Judge Deady in 1880) 6 Fed. 256; In re Kanaka Nian (decided by the supreme court of Utah in 1889) 21 Pac. 993; In re Saito (decided by Judge Colt in 1894) 62 Fed. 126; and 2 Kent, Comm. 73, where the learned chancellor expresses a doubt in these words:

"Perhaps there might be difficulties also as to the copper-colored natives of America, or the yellow or tawny races of Asiatics, and it may well be doubted whether any of them are white persons, within the purview of the law."

Of the four cases above cited, In re Ah Yup is the first in point of time, and the leading one. The four applications were denied, Ah Yup being a native of China, Camille a native of British Columbia, and of half Indian and half white. blood, Nian a native of the Hawaiian Islands, whose ancestors were Kanakas, and Saito a native of Japan. When the Case of Ah Yup was decided, the Chinese question was flagrant on the Pacific slope, and Judge Sawyer seemed to think, predicating his conclusion upon the debates in congress, that

the purpose of the amendment extending the right of naturalization to Africans and persons of African descent was to exclude Chinese from the benefits of naturalization. To quote his own language:

"Many other senators spoke pro and con on the question, this being the point of the contest, and these extracts being fair examples of the opposing opinions. * * * It was finally defeated [the amendment to strike the word "white" from the naturalization laws]; and the amendment cited, extending the right of naturalization to the African only, was adopted. It is clear from these proceedings that congress retained the word 'white' in the naturalization laws for the sole purpose of excluding the Chinese from the right of naturalization. * * * Thus, whatever latitudinarian construction might otherwise have been given to the term 'white person,' it is entirely clear that congress intended by this legislation to exclude Mongolians from the right of naturalization. I am therefore of the opinion that a native of China, of the Mongolian race, is not a white person, within the meaning of the act of congress. The second question is answered in the discussion of the first. The amendment is intended to limit the operation of the provision as it then stood in the Revised Statutes. It would have been more appropriately inserted in section 2165 than where it is found, in section 2169. But the purpose is clear. It was certainly intended to have some operation, or it would not have been adopted. The purpose undoubtedly was to restore the law to the condition in which it stood before the revision, and to exclude the Chinese. It was intended to exclude some classes, and, as all white aliens and those of the African race are entitled to naturalization under other words, it is difficult to perceive whom it could exclude, unless it be the Chinese."

The opinion of Judge Sawyer is by no means decisive of the present question, as his language may well convey the meaning that the amendment of the naturalization statutes referred to by him was intended solely as a prohibition against the naturalization of members of the Mongolian race. The naturalization of Chinese is, however, no longer an open question, as section 14 of the act of May 6, 1882, expressly provides "that hereafter no state court or court of the United States shall admit Chinese to citizenship; and all laws in conflict with this act are hereby repealed." 22 Stat. 61.

If Chinese were denied the right to become naturalized citizens under laws existing when In re Ah Yup was decided, why did congress subsequently enact the prohibitory statute above quoted? Indeed, it is a debatable question whether the term "free white person," as used in the original act of 1790, was not employed for the sole purpose of withholding the right of citizenship from the black or African race and the Indians then inhabiting this country. But it is not necessary to enter upon a discussion of that question; nor is it deemed material to inquire to what race ethnological writers would assign the present applicant. If the strict scientific classification of the anthropologist should be adopted, he would probably not be classed as white. It is certain he is not an African, nor a person of African descent. According to his own statement, he is a "pure-blooded Mexican," bearing no relation to the Aztecs or original races of Mexico. Being, then, a citizen of Mexico, may he be naturalized pursuant to the laws of congress? If debarred by the strict letter of the law from receiving letters of citizenship, is he embraced within the intent and meaning of the statute? If he falls within the meaning and intent of the law, his application should be granted, notwithstanding the letter of the statute may be against him.

In Holy Trinity Church v. U. S., 143 U. S. 459, 12 Sup. Ct. 512, it is said by the supreme court:

"It is a familiar rule that a thing may be within the letter of the statute, and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question; and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results · which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act. As said in Plowden, 205: 'From which cases it appears that the sages of the law heretofore have construed statutes quite contrary to the letter in some appearance, and those statutes which comprehend all things in the letter they have expounded to extend to but some things, and those which generally prohibit all people from doing such an act they have interpreted to permit some people to do it, and those which include every person in the letter they have adjudged to reach to some persons only, which expositions have always been founded upon the intent of the legislature, which they have collected sometimes by considering the cause and necessity of making the act, sometimes by comparing one part of the act with another, and sometimes by foreign circumstances.' "

A reference to the constitution of the republic of Texas and the constitution, laws, and treaties of the United States will disclose that both that republic and the United States have freely, during the past 60 years, conferred upon Mexicans the rights and privileges of American citizenship, not individually, it is true, but by various collective acts of naturalization. The first of such acts will be found in the language of section 10 of the general provisions of the constitution of the republic of Texas, adopted in 1836. By that section it is provided:

"All persons (Africans, the descendants of Africans, and the Indians excepted) who were residing in Texas on the day of the declaration of independence [March 2, 1836] shall be considered citizens of the republic, and entitled to all the privileges of such."

Under this provision, Mexicans who resided in Texas on March 2, 1836, became citizens of the republic (Kilpatrick v. Sisneros, 23 Tex. 113; Hardy v. De Leon, 5 Tex. 212; 13 Ops. Attys. Gen. 397, 398); and by the resolutions of March 1, 1845, and December 29, 1845, passed by the national congress, all such citizens, without express authorization, became incorporated into the citizenship of the Union. Thus, it is said by the supreme court, in Boyd v. Nebraska, 143 U. S. 169, 12 Sup. Ct. 385:

"By the annexation of Texas, under a joint resolution of congress of March 1, 1845, and its admission into the Union on an equal footing with the original states, December 29, 1845, all the citizens of the former republic became, without any express declaration, citizens of the United States. 5 Stat. 798; 9 Stat. 108; McKinney v. Saviego, 18 How. 235; Cryer v. Andrews, 11 Tex. 170; Barrett v. Kelly, 31 Tex. 476; Carter v. New Mexico, 1 N. M. 317."

See, also, Lawr. Wheat. (Append.) 897; Morse, Citizenship, § 94.

The next collective act in chronological order, providing for the naturalization of Mexicans, is the treaty concluded between the United States and Mexico, February 2, 1848, commonly known as the

"Treaty of Guadalupe-Hidalgo." The eighth article of that treaty is as follows:

"Art. 8. Mexicans now established in territories previously belonging to Mexico, and which remain for the future within the limits of the United States, as defined by the present treaty, shall be free to continue where they now reside, or to remove at any time to the Mexican republic, retaining the property which they possess in the said territories, or disposing thereof, and removing the proceeds wherever they please, without their being subjected, on this account, to any contribution, tax, or charge whatever. Those who shall prefer to remain in the said territories may either retain the title and rights of Mexican citizens, or acquire those of citizens of the United States. But they shall be under the obligation to make their election within one year from the date of the exchange of ratifications of this treaty; and those who shall remain in the said territories after the expiration of that year, without having declared their intention to retain the character of Mexicans, shall be considered to have elected to become citizens of the United States. In the said territories, property of every kind, now belonging to Mexicans not established there, shall be inviolably respected. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it guaranties equally ample as if the same belonged to citizens of the United States."

That Mexicans who remained in the territory ceded by the treaty of 1848, and who failed to declare their intention within the time limited to remain citizens of Mexico, became citizens of the United States, is a fact scarcely open to serious controversy. In Boyd v. Nebraska, supra, it is said by the supreme court, speaking through Mr. Chief Justice Fuller, that:

"By the eighth article of the treaty with Mexico of 1848, those Mexicans who remained in the territory ceded, and who did not declare within one year their intention to remain Mexican citizens, were to be deemed citizens of the United States."

Speaking of the treaty with Spain, which is similar in essential particulars to the treaty of 1848 with Mexico, the supreme court says:

"On the 22d of February, 1819, Spain ceded Florida to the United States. The sixth article of the treaty of cession contains the following provision: 'The inhabitants of the territories, which his Catholic majesty cedes to the United States by this treaty, shall be incorporated in the Union of the United States as soon as may be consistent with the principles of the federal constitution, and admitted to the enjoyment of the privileges, rights, and immunities of the citizens of the United States.' This treaty is the law of the land, and admits the inhabitants of Florida to the enjoyment of the privileges, rights, and immunities of the citizens of the United States. It is unnecessary to inquire whether this is not their condition, independent of stipulation. They do not, however, participate in political power. They do not share in the government till Florida shall become a state." Insurance Co. v. Canter, 1 Pet. 542.

It is said by Mr. Justice McLean, in his dissenting opinion in Scott v. Sandford, 19 How. 533, that:

"On the question of citizenship it must be admitted that we have not been very fastidious. Under the late treaty with Mexico, we have made citizens of all grades, combinations, and colors. The same was done in the admission of Louisiana and Florida. No one ever doubted, and no court ever held, that the people of these territories did not become citizens under the treaty. They have exercised all the rights of citizens, without being naturalized under the acts of congress."

Upon articles 8 and 9 of the treaty of Guadalupe-Hidalgo a similar construction has been placed by the supreme court of California.

People v. De La Guerra, 40 Cal. 311. See, also, Morse, Citizenship, § 94.

On September 9, 1850, congress passed three acts having more or less bearing upon the question under discussion, to wit, the act for the admission of California into the Union (9 Stat. 452), and the acts establishing territorial governments for New Mexico and Utah (9 Stat. 446, 453). By the act admitting California, Mexicans who were recognized as citizens by the treaty of Guadalupe-Hidalgo became citizens of the new state. See authorities above referred to.

Section 5 of the act "to establish a territorial government for Utah," which adopts literally the language of section 6 of the New Mexico act, provides as follows:

"And be it further enacted, that every free white male inhabitant above the age of twenty-one years, who shall have been a resident of said territory at the time of the passage of this act, shall be entitled to vote at the first election, and shall be eligible to any office within the said territory; but the qualifications of voters and of holding office, at all subsequent elections, shall be such as shall be prescribed by the legislative assembly: provided, that the right of suffrage and of holding office shall be exercised only by the citizens of the United States, including those recognized as citizens by the treaty with the republic of Mexico, concluded February second, eighteen hundred and forty-eight."

It has been shown that Mexicans (and the term includes all Mexicans, without discrimination as to color) who remained in the ceded territory, and who failed to declare their intention within one year to remain Mexican citizens, became, by virtue of the stipulations of the treaty of February 2, 1848, citizens of the United States. Whether congress intended to include Mexicans in the expression "white male inhabitants," as employed in the territorial acts above mentioned, may admit of question. But it is entirely clear, whatever meaning may be attached to those words, that the language of the acts explicitly recognized Mexicans who remained in the ceded territory, and who did not renounce their Mexican citizenship within one year, as citizens of the United States, and conferred upon them the elective franchise, and the important and valuable right to hold office. It is equally true that by article 5 of the treaty between the United States and Mexico proclaimed June 30, 1854, known as the "Gadsden Treaty," Mexicans who remained within the territory ceded by Mexico to the United States in article 1 of the treaty, and who failed to renounce their Mexican citizenship within a year, became citizens of the United States.

The next act affecting the question of citizenship to which attention will be directed is the fourteenth amendment of the constitution, declared to be part of the organic law, by resolution of congress, July 21, 1868 (15 Stat. 709, 711). By this amendment, which completely overthrew the last remaining vestige of the doctrine announced in Scott v. Sandford, 19 How. 393, touching the question of citizenship of the African, and invested the native-born negro with the rights of an American citizen (Slaughterhouse Cases, 16 Wall. 36; Elk v. Wilkins, 112 U. S. 101, 5 Sup. Ct. 41; Strauder v. West Virginia, 100 U. S. 306–308; In re Look Tin Sing, 21 Fed. 909), it is provided:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside."

See, also, Rev. St. § 1992.

While this amendment, as held in the authorities last cited, was intended primarily for the benefit of the negro race, it also confers the right of citizenship upon persons of all other races, white, yellow, or red, born or naturalized in the United States, and "subject to the jurisdiction thereof." The language has been held to embrace even Chinese, to whom the laws of naturalization do not extend. In re Look Tin Sing, supra; Gee Fook Sing v. U. S., 1 C. C. A. 211, 49 Fed. 146; Ex parte Chin King, 35 Fed. 354; In re Yung Sing Hee, 36 Fed. 437; In re Wong Kim Ark, 71 Fed. 382. Mexicans, therefore, born in the United States, and who, at the date of birth, were subject to the jurisdiction of our government,—as all were, except children of diplomatic officers, and a few others, not necessary in this connection to notice (In re Look Tin Sing, supra),—are citizens of the United States and of the state wherein they reside. The intimation in some of the briefs of counsel that Elk v. Wilkins, 112 U. S. 94, 5 Sup. Ct. 41, excludes Mexicans from citizenship, is not maintainable. That case refers exclusively to tribal Indians born and residing within the territory forming a part of the United States. The following extract taken from the syllabus of the case will disclose the point decided:

"An Indian, born a member of one of the Indian tribes within the United States, which still exists and is recognized as a tribe by the government of the United States, who has voluntarily separated himself from his tribe, and taken up his residence among the white citizens of a state, but who has not been naturalized or taxed or recognized as a citizen either by the United States or by the state, is not a citizen of the United States, within the meaning of the first section of the fourteenth article of amendment of the constitution."

In a word, Elk's severance of his tribal relations had not been accepted by the United States, and, within the meaning of the amendment, he was not regarded as having been born "subject to the jurisdiction thereof." The dissimilarity between the Elk Case and the one at bar is so pronounced that further reference to it is not deemed essential.

There was concluded at Washington, July 10, 1868, it may be said contemporaneously with the adoption of the fourteenth amendment, a treaty between the United States and Mexico, "relative to naturalization." Pursuant to notice given by the Mexican government, this treaty, as the court is informed by the secretary of state, was terminated February 11, 1882. It is therefore not now operative, and reference is made to it only for the purpose of indicating the construction placed upon our naturalization laws at that time by the treaty-making power of the respective governments. The first article of that treaty provides:

"Article 1. Those citizens of the United States who have been made citizens of the Mexican republic by naturalization, and have resided without interruption in Mexican territory five years, shall be held by the United States as citizens of the Mexican republic, and shall be treated as such. Reciprocally, citizens of the Mexican republic who have become citizens of the United States, and who have resided uninterruptedly in the territory of the United States

for five years, shall be held by the republic of Mexico as citizens of the United States, and shall be treated as such. The declaration of an intention to become a citizen of the one or the other country has not for either party the effect of naturalization. This article shall apply as well to those already naturalized in either of the countries contracting as to those hereafter naturalized."

Two conclusions are fairly deducible from an analysis of the foregoing language: (1) The two high contracting parties recognized that Mexicans were embraced within our naturalization laws; and (2) that they had the right, individually, to invoke the aid of the statute, notwithstanding the provision which at that time limited the right of naturalization, to free white persons.

When all the foregoing laws, treaties, and constitutional provisions are considered, which either affirmatively confer the rights of citizenship upon Mexicans, or tacitly recognize in them the right of individual naturalization, the conclusion forces itself upon the mind that citizens of Mexico are eligible to American citizenship, and may be individually naturalized by complying with the provisions of our laws. And this conviction is further strengthened by a consideration of the first section of the act of July 27, 1868, re-enacted as section 1999 of the Revised Statutes. Its language is as follows:

"Whereas the right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness; and whereas in the recognition of this principle this government has freely received emigrants from all nations, and invested them with the rights of citizenship; and whereas it is claimed that such American citizens, with their descendants, are subjects of foreign states, owing allegiance to the governments thereof; and whereas it is necessary to the maintenance of public peace that this claim of foreign allegiance should be promptly and finally disavowed: Therefore any declaration, instruction, opinion, order, or decision of any officer of the United States which denies, restricts, impairs, or questions the right of expatriation, is declared inconsistent with the fundamental principles of the republic."

It will be observed the preamble declares that we have freely received emigrants from all nations, and invested them with the rights of citizens; and the enacting clause denounces, as inconsistent with the fundamental principles of the republic, any opinion, decision, or order of any United States officer which denies, restricts, impairs, or questions the right of expatriation. It may appropriately be said that naturalization is the final step in the process of expatriation, and, literally construed, any order, opinion, or decision of a United States officer denying, restricting, or questioning the right to become a naturalized citizen, save as to Chinese, would come within the denunciation of the statute. It is probable that the statute was not intended to have an effect so far reaching in its consequences, and that the primary purpose was, as the title of the original act asserts, to protect the rights of American citizens in foreign states. But the language of the act is significant as illustrating the policy of the government "to bestow," using the words of Vice Chancellor Sandford, "the right of citizenship freely, and with a liberality unknown in the old world." Lynch v. Clarke, 1 Sandf. Ch. 661.

After a careful and patient investigation of the question discussed, the court is of opinion that, whatever may be the status of the applicant viewed solely from the standpoint of the ethnologist, he is em-

braced within the spirit and intent of our laws upon naturalization, and his application should be granted if he is shown by the testimony to be a man attached to the principles of the constitution, and well disposed to the good order and happiness of the same. It is suggested that the proof fails in this respect; and the objection appears to be based upon the ground, intimated in the briefs, of his inability to understand or explain those principles. That the applicant is lamentably ignorant is conceded, and that he is unable to read and write the testimony clearly discloses. Naturally enough, his untrained mind is found deficient in the power to elucidate or define the principles of the constitution. But the testimony also discloses that he is a very good man, peaceable and industrious, of good moral character, and law abiding "to a remarkable degree." And hence it may be said of him, notwithstanding his inability to undergo an examination on questions of constitutional law, that by his daily walk, during a residence of 10 years in the city of San Antonio, he has practically illustrated and emphasized his attachment to the principles of the constitution. Congress has not seen fit to require of applicants for naturalization an educational qualification, and courts should be careful to avoid judicial legislation. In the judgment of the court, the applicant possesses the requisite qualifications for citizenship, and his application will therefore be granted.

NOTE BY THE COURT. The first naturalization act was approved March 26, 1790 (1 Stat. 103). By section 1 of this act it is provided "that any alien, being a free white person, * * * may be admitted to become a citizen," etc. This act was repealed by the act approved January 29, 1795 (1 Stat. 414), which was in turn repealed by the act of April 14, 1802. Both of these last-named acts confined naturalization to aliens being free white persons. This rule continued in force until 1870, when the law was amended to include aliens of African nativity and persons of African descent. "Such was the law on the statute book," says Mr. Morse, "when the revisers of the United States statutes prepared their revision, which, in the first draft, was formulated as follows: 'The provisions of this title shall apply to aliens of African nativity, and to persons of African descent.'" Morse, Citizenship, § 189. In 1875 this section was so amended as to include free white persons, and the law as amended and now in force reads as follows: "The provisions of this title shall apply to aliens (being free white persons, and to aliens) of African nativity, and to persons of African descent." Rev. St. (2d Ed.) § 2169.

### Ex parte SAUER.

(District Court of Texas, Uvalde County. September Term, 1891.)

PASCHAL, J. In the matter of the application of Richard V. Sauer, an alien and subject of the emperor of Germany, to be admitted to become a citizen of the United States of America, I have refused to grant the application for final naturalization, and assign the following reasons therefor:

The witnesses whom he presented in support of his application had no personal or direct knowledge as to applicant's "attachment to the principles of the constitution of the United States," never having heard him refer to the constitution or the principles contained in that instrument; neither had they any such knowledge of his being "well disposed to the good order and happiness of the same," but inferred such to be the case from the fact that applicant was an industrious, law-abiding man. I then questioned Sauer upon these important points, he failing to tender other evidence upon them, when he asserted that he was a socialist, and a firm believer in the doctrines of socialism. Johann Most, the great apostle, being, as he informed me, greatly misunderstood. Thereupon I stated that, in the judgment of the

court, the principles of socialism are directly at war with and antagonistical to the principles of the constitution. of the United States of America, and absolutely inconsistent with his being "well disposed to the good order and happiness" of the people and government of this country. I then asked him to state some of its leading principles. He replied that they contemplated the ownership and operation of all railroads and transportation lines of the country by the government, and that, as land was as free as air and water, socialists demanded the forced sale of all lands owned by the citizens in excess of that which was actually necessary to make a living upon (estimated by him at 200 acres), to the government, for the purpose of giving it to those who owned none. I sought to point out to him how such ideas were un-American, impracticable, and dangerous in the extreme to society as organized throughout the civilized world, and particularly in this free country. I furthermore explained to him that private property could not, under the constitution, be taken by the government for private use, and that this was a fundamental principle of the government, and one of the most sacred and jealously guarded rights of the citizen. He repelled these suggestions with derision and scorn, maintaining his right to his views. I informed him that while it was true that he or any naturalized citizen had an indisputable right to such sentiments, and to their free utterance, as well as to any other views they might entertain upon government, yet when a foreigner openly confesses to have such opinions, and, declaring his intentions to promulgate and carry them out, seeks to be admitted to American citizenship, it would be contrary to his oath of naturalization, and violative of the spirit and principles on which this government is founded and depends for its welfare, to admit him to citizenship.

For these reasons, and because I am of opinion that the time is upon us when the safety and perpetuity of our free institutions and of constitutional government in the land, as well as the good order and happiness of the people, demand that those who apply for the privilege, honor, and distinction of becoming American citizens should be free from doctrines which are not only subversive of constitutional government and our free institutions, but of organized society itself, have I deemed it wise and meet to deny the application of Richard V. Sauer, while he harbors such views, to become a citizen of the United States of America.